UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-4298
(5:09-cr-00321-D-1)

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

GREGORY BARTKO,

Defendant - Appellant.

O R D E R

The Court amends its opinion filed August 23, 2013, as follows:

On page 17, in the citation to United States v. Bartko slip op., "W.D.N.C." is corrected to read "E.D.N.C."

On page 30, Part III, second paragraph, line 4, the spelling of "Jenks" is corrected to read "Jencks."

For the Court – By Direction

/s/ Patricia S. Connor
Clerk

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-4298

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

GREGORY BARTKO,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.   James C. Dever III, Chief District Judge.  (5:09-cr-00321-D-1)

Argued: May 17, 2013             Decided: August 23, 2013

Before KEENAN and FLOYD, Circuit Judges, and Henry E. HUDSON, United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed by published opinion.  Judge Floyd wrote the opinion, in which Judge Keenan and Judge Hudson concurred.

**ARGUED:** Donald Franklin Samuel, GARLAND, SAMUEL & LOEB, Atlanta, Georgia, for Appellant.  Kristine L. Fritz, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.   **ON BRIEF:** Amanda R. Clark-Palmer, GARLAND, SAMUEL & LOEB, Atlanta, Georgia, for Appellant.   Thomas G. Walker, United States Attorney, Jennifer P. May-Parker, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

FLOYD, Circuit Judge:

Appellant Gregory Bartko was charged by a superseding indictment with conspiracy to commit mail fraud, launder money instruments, engage in unlawful monetary transactions, make false statements, and obstruct proceedings of the Securities and Exchange Commission (SEC), in violation of 18 U.S.C. § 371 (Count One); mail fraud and aiding and abetting, in violation of 18 U.S.C. §§ 1341 and 2 (Count Two through Count Five); sale of unregistered securities and aiding and abetting, in violation of 15 U.S.C. §§ 77e, 77x, and 18 U.S.C. § 2 (Count Six); and making false statements to a federal agent in January and October 2009, in violation of 18 U.S.C. § 1001(a)(2) (Counts Seven and Eight). Before trial, and pursuant to the government's motion, the district court dismissed Counts Seven and Eight, as well as two of the objects of the conspiracy in Count One—making false statements and obstructing SEC proceedings. After a thirteen-day trial, the jury convicted Bartko of the remaining counts.

Thereafter, Bartko filed four motions for a new trial, all of which the district court denied. The district court subsequently sentenced Bartko to 272 months' imprisonment. This timely appeal followed.

In his appeal, Bartko maintains that the district court erred in denying two of his motions for a new trial, improperly considered an ex parte sealed document submitted by the

2

government, abused its discretion by not instructing the jury on accomplice/informant testimony and on multiple conspiracies, and improperly imposed Sentencing Guidelines enhancements based on the amount of loss, the number of victims, and Bartko's status as a registered broker/dealer at the time of the offenses. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). Discerning no reversible error, we affirm both Bartko's conviction and sentence.

I.

From 2004 to 2005, Bartko was the leader and organizer of a financial scheme that involved securing money from investors to provide funding for two private equity funds, the Caledonian Fund and the Capstone Fund. John Colvin, Scott Hollenbeck, Darryl Laws, Rebecca Plummer, and Levonda Leamon participated in the scheme. As a part of their scheme, the parties mailed, faxed, and e-mailed correspondence to one another and engaged in banking transactions.

Bartko was a securities attorney, investment banker, and registered broker/dealer. Laws was also an investment banker who, along with Bartko, created the Caledonian Fund. Colvin was the president of Colvin Enterprises and a co-managing general partner with Scott Hollenbeck of Franklin Asset Exchange.

3

Leamon and Plummer were financial advisors who owned and operated Legacy Resource Management (LRM).

In January 2004, Bartko was seeking investors for the Caledonian Fund. On January 15, 2004, Colvin sent to Bartko a fax regarding an investment opportunity that one of Colvin's companies, Webb Financial Services, was offering. The articles of incorporation for the company were attached. They listed Scott Hollenbeck as the initial registered agent of Webb Group. These materials made fraudulent claims that the principal and interest were guaranteed and that the investments were insured. On January 15 and 16, 2004, Bartko performed a record check on Colvin with the National Association of Securities Dealers. On February 17, 2004, he made the same record check on Hollenbeck. According to those records, both had past allegations of forgery and both had been fired from securities-related jobs. Hollenbeck's check also showed that his securities license had been suspended for violations of securities rules.

Bartko sent a fax to Laws on January 19, 2004, which detailed Colvin's fraudulent fundraising methods. For example, one page of the materials stated that "[p]rincipal investment is secured & insured [and that the] [i]nterest rate declared is guaranteed[.]" In a fax that Colvin sent to Bartko on February 9, 2004, proposing an agreement between Franklin Asset Exchange and the Caledonian Fund, Hollenbeck was referred to in the

4

materials as a "Co-Managing General Partner" of Franklin Asset Exchange and as "the founder and creator of both Franklin Asset Exchange, LLC and The Webb Group Financial Services, Inc."

Colvin ultimately agreed to raise $3 million for the Caledonian fund through the Franklin Asset Exchange. Although the March 30, 2004, agreement to raise the money was signed by Colvin, it was Hollenbeck who actually solicited and secured the money from the individual investors.

In April 2004, the North Carolina Securities Regulatory Agency issued a cease and desist order directing Hollenbeck to stop selling securities in North Carolina. This arose from his involvement in a separate investment scheme regarding Mobile Billboards of America (Mobile Billboards). Bartko, along with his co-counsel, Wes Covington, provided legal representation to Hollenbeck on this matter. During the course of that representation, Hollenbeck provided Bartko with information concerning how he had sold the Mobile Billboards investments. Hollenbeck informed Bartko that he had promised investors that their money was guaranteed and insured. He also provided to Bartko a copy of his promotional materials, including an application for an insurance policy that he used to show that the investment was insured.

From January 15, 2004, to May 6, 2004, Hollenbeck fraudulently raised large amounts of money for the Caledonian

5

Fund, as well as for other investments, from a total of 171 investors. He then deposited the money into Franklin Asset Exchange or some similar account. The money was not separated but was instead comingled. He sent the money to various entities, as directed by Colvin.

Hollenbeck and Colvin raised $701,000 for the Caledonian Fund, which was wired to the Caledonian Fund on four separate occasions between February and May 2004. Bartko and Laws used the money to pay salaries and expenses. None of it was used for investments or loans.

In late 2004, after Colvin failed to send Bartko the $3 million that he had promised, Bartko terminated their relationship. In November 2004, the Caledonian Fund dissolved. The $701,000 in the fund was not returned to the investors.

Almost immediately after dissolution of the Caledonian Fund, Bartko began the Capstone Fund. Hollenbeck was the primary fundraiser. Nevertheless, on December 8, 2004, during a deposition with the SEC concerning Mobile Billboards, Hollenbeck was asked what investments he was currently selling. He failed to mention the Capstone Fund. Bartko and his co-counsel, Wes Covington, were at the deposition representing Hollenbeck, but neither one corrected Hollenbeck's false statement.

6

Although securities law disallowed it, Hollenbeck continued selling securities and raising money for the Capstone Fund through fraudulent means. Moreover, some of the investors were not accredited or sophisticated investors, as required by securities law. To be an accredited investor, one's net worth or net income must reach a certain threshold.

On January 11, 2005, Bartko met with potential investors at LRM. Around the same time as this meeting, Bartko asked Plummer and Leamon whether LRM would receive money from the Capstone Fund's investors and then send the money back to the Capstone Fund. Because the money that Hollenbeck had raised—over $1 million at that point—was fraudulently obtained and because the Capstone Fund was an unregistered fund, Bartko wanted LRM to appear to be the investor. Plummer and Leamon agreed, and on January 19, 2005, they opened a bank account with TriStone Bank for the purpose of receiving the Capstone Fund money. TriStone, however, eventually closed their account and so, at Bartko's suggestion, they opened an account with Wachovia.

Also on January 19, 2005, Bartko issued reimbursement checks to several investors. But then Bartko instructed Hollenbeck to have the investors receiving the reimbursements endorse the checks and return them to LRM. Bartko sent some of the checks to Hollenbeck to return to the investors because he did not have their addresses. Instead, Hollenbeck forged the

7

signatures of the investors on the checks and embezzled the proceeds.

The money that was sent to LRM was returned to the Capstone Fund. Thus, with the exception of one individual, no refunds were actually made to the investors. All told, Bartko received $2,684,928.86 from forty Capstone Fund investors.

In February 2005, the North Carolina Secretary of State learned that Hollenbeck was continuing to sell investments for Bartko, and it advised the SEC of that fact. On March 14, 2005, Alex Rue, an attorney for the SEC, confronted Bartko. Bartko then filed an interpleader action in the Middle District of North Carolina on May 26, 2005, and ultimately returned ninety-four percent of the Capstone Fund money to the court.

Bartko eventually stood trial for conspiracy to commit mail fraud, launder money instruments, and engage in unlawful monetary transactions (Count One); mail fraud and aiding and abetting (Count Two through Count Five); and sale of unregistered securities and aiding and abetting (Count Six). The district court dismissed Counts Seven and Eight, as well as two of the objects of the conspiracy in Count One—false statements and obstructing SEC proceedings. After a thirteen-day trial, the jury convicted Bartko of the remaining counts.

Bartko then filed four motions for a new trial. The district court denied them all in a comprehensive and well-

reasoned 120-page order. At the subsequent sentencing hearing, Bartko objected to several of the Sentencing Guidelines enhancements, including those based on the amount of loss, the number of victims, and Bartko's status as a registered broker/dealer at the time of the offenses. The district court overruled the objections and sentenced Bartko to 272 months' imprisonment. This appeal followed.

## II.

First, Bartko argues that the district court erred in denying two of his motions for a new trial. Rule 33 of the Federal Rules of Criminal Procedure provides, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. "We review the district court's denial of a motion for a new trial under an abuse of discretion standard." United States v. Wilson, 624 F.3d 640, 660 (4th Cir. 2010).

## A.

Bartko's first motion for a new trial concerns a report on Internal Revenue Agent Scott Schiller's interview with Judge Anderson Cromer, who presided over receivership litigation involving Webb Group and Franklin Asset Exchange as plaintiffs

9

and Bull Mountain Project, Colvin, Colvin Enterprises, and others as defendants. Bartko and Covington had represented the plaintiffs and had obtained a substantial settlement. The government failed to give this report to Bartko until after trial.

In the fact section of Bartko's opening brief, he states the following:

> This interview summary, referred to in Bartko's new trial motions as the Judge Cromer "302," revealed that the judge believed that Bartko had performed ethically and professionally in connection with the coal company litigation and that Bartko had made disclosure of his prior relationship with Colvin, Hollenbeck and the proposed receiver. Because that information had not previously been furnished to the defense, the defense did not know that Judge Cromer's testimony would have been favorable. He was, therefore, never called as a witness and the topic of the coal company litigation was never raised at trial. The jury never learned that Bartko's efforts on behalf of Hollenbeck's victims in other schemes resulted in a $20 million recovery for the people he—Bartko—supposedly victimized.

The only mention that Bartko makes in the argument section of his opening brief, however, is that the interview report "related to Mr. Bartko's actual innocence of the charges in this case, because that information related to his behavior and state of mind, rather than the credibility of any particular witness." Bartko also states that the government agreed "when it moved to exclude this evidence" that it "would have unfairly cast Bartko in a favorable light."

10

After reading Bartko's opening brief, it first appeared to us, as it did to the government, that Bartko was not raising this issue on appeal. But, then in his reply brief, buried in a footnote, he states that it is an issue in this appeal and that "this Brady violation [was] a component of his argument that the cumulative effect of the withheld evidence resulted in a trial that was unfair."

The argument section of an appellant's opening brief must contain the "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." Fed. R. App. P. 28(a)(9)(A). Because Bartko has failed in this regard, we consider this issue waived. See Wahi v. Charleston Area Med. Ctr., 562 F.3d 599, 607 (4th Cir. 2009) (concluding that those issues on which the appellant failed to comply with the specific dictates of Rule 28(a)(9)(A) were waived).

## B.

In Bartko's second motion for a new trial, he protests that the government allowed Scott Hollenbeck to testify falsely that he had not received any promises or inducements in exchange for his trial testimony. The Supreme Court long ago opined that "a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction." Napue v. Illinois,

360 U.S. 264, 269 (1959). "This is true regardless of whether the [g]overnment solicited testimony it knew or should have known to be false or simply allowed such testimony to pass uncorrected." United States v. Kelly, 35 F.3d 929, 933 (4th Cir. 1994). A new trial is required when the government's knowing use of false testimony could affect the judgment of the jury. See Giglio v. United States, 405 U.S. 150, 154 (1972). "We do not, however, automatically require a new trial whenever 'a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict. . . .'" Id. (quoting United States v. Keogh, 391 F.2d 138, 148 (2d Cir. 1968)).

To obtain a new trial on the basis that Hollenbeck testified falsely, Bartko must demonstrate that Hollenbeck gave false testimony; he need not demonstrate that Hollenbeck committed perjury. "[D]ue process is violated not only where the prosecution uses perjured testimony to support its case, but also where it uses evidence which it knows creates a false impression of a material fact." Hamric v. Bailey, 386 F.2d 390, 394 (4th Cir. 1967). Hence, "[e]vidence may be false either because it is perjured, or, though not itself factually inaccurate, because it creates a false impression of facts which are known not to be true." Id.

12

In early 2009, as part of its investigation of the Capstone Fund, as well as several other investment schemes, the United States Attorney for the Eastern District of North Carolina wanted to interview Scott Hollenbeck. Thus, the government entered into a proffer agreement with him and his attorney, Scott Holmes. The agreement, directed to Holmes but signed by both Holmes and Hollenbeck, set forth the following:

> As you have indicated, your client, Mr. Hollenbeck, is interested in meeting with federal agents currently investigating the sale of numerous investments, including Webb Group, Franklin Asset Exchange, Disciples Trust, and Capstone. I have informed you that Mr. Hollenbeck is not a target of this investigation. The parties will schedule an interview of Mr. Hollenbeck to take place at the Federal Correctional Institution in Coleman, Florida. Mr. Hollenbeck, you, and the United States Attorney's Office (USAO) agree as follows concerning the "ground rules" for this interview:
>
> 1. In any trial in this matter, the USAO will not offer into evidence in its case in-chief or at sentencing any statements made by Mr. Hollenbeck at the interview; provided, however, this Paragraph 1 shall not apply to any prosecution for false statements, obstruction of justice, or perjury that is based in whole or in part on statements made by Mr. Hollenbeck at the interview.
>
> 2. Notwithstanding Paragraph 1 above:
>
>    a. the USAO may use information derived directly or indirectly from statements made by Mr. Hollenbeck at the interview for the purpose of obtaining other evidence, and that evidence may be used in the prosecution and sentencing of Mr. Hollenbeck by the USAO; in any trial of this matter or at sentencing, the USAO may use statements made

13

by Mr. Hollenbeck at the interview to cross-examine him if he testifies or to rebut any evidence offered by or on behalf of him.

3.      This agreement is limited to statements made by Mr. Hollenbeck at the interview and does not apply to any other statements made by Mr. Hollenbeck at any other time. No understandings, promises, or agreements exist with respect to the meeting other than those set forth in this agreement, and none will be entered into unless memorialized in writing and signed by all parties.

4.      The USAO will not share the statements made by Mr. Hollenbeck during the interview with any other state or federal prosecuting entity unless the prosecuting entity agrees to be bound by the terms of this agreement.

Please return the original signed copy of this letter agreement prior to the interview.

Scott Hollenbeck's wife, Crystal Hollenbeck, also entered into a proffer agreement with the government. It is almost identical to her husband's agreement.

At trial, on direct examination, the government asked Hollenbeck, "Mr. Hollenbeck, what if any promises has the government made to you about your testimony here today?" Hollenbeck responded, "None." Despite any contrary suggestion by Bartko, our review of the record convinces us that this was a truthful statement.

Bartko makes much of the fact that the agreements stated that the Hollenbecks were not targets of the investigation into the sale of investments, including Webb Group, Franklin Asset

14

Exchange, Disciples Trust, and the Capstone Fund. From this, Bartko concludes that Hollenbeck had some sort of incentive to assist the government in its prosecution of Bartko. But that is not how we interpret the agreement.

Paragraph three of the agreements make clear that "[n]o understandings, promises, or agreements exist[ed] with respect to the meeting other than those set forth in th[e] agreement[s], and none will be entered into unless memorialized in writing and signed by all parties." Because nothing in the agreements suggests that the Hollenbecks not being a target was conditioned on their participation in the investigative interviews, or that they would not be a target in the future, we decline to graft such a provision into the agreements.

Therefore, Hollenbeck's answer that he had not been promised anything in return for his testimony at trial was true. But, his answer to the follow-up question by his counsel was not. During cross-examination of Hollenbeck, Bartko's counsel asked, "Now, one of the things that you said when you took the stand was that the government has made you no promises, correct? You said that?" Hollenbeck replied, "That is exactly right." Then defense counsel followed up: "And the government has not, as of this time, made you any promises, have they?" Hollenbeck answered, "They have not." The district court held that Hollenbeck's answer to this question was not false. However, it

15

provided an alternative analysis on the assumption that Hollenbeck's testimony on this point was false.

From our review of the record, we conclude that the government had made a promise to Hollenbeck. In fact, it made to him several promises concerning how the information that he gave at the investigatory interview would and would not be used against him. And, because the government made those promises, it had a duty to correct Hollenbeck's answers when he testified falsely that it had not made any promises. But this it regrettably failed to do. Therefore, we must now decide whether that testimony could have affected the jury's judgment.

Had Hollenbeck testified truthfully when asked whether the government had made any promises to him up to that time, Bartko arguably could have used that fact to impeach Hollenbeck. But, having made an exhaustive review of the record, we do not think that impeachment could have made an iota of difference in the jury's final judgment. As explained by the district court,

> [d]efense counsel thoroughly impeached Hollenbeck on the subject of bias in favor of the government and on Hollenbeck's motive to lie to please the government. Defense counsel thoroughly impeached Hollenbeck concerning his desire to avoid prosecution for his fraud involving Colvin, Webb Group, Franklin Asset Exchange, Disciple Trust, the Caledonian Fund, and the Capstone Fund. Defense counsel thoroughly impeached Hollenbeck about his desire to receive a cooperation-based reduction in his 168-month prison sentence stemming from the Mobile Billboards fraud. Furthermore, defense counsel explored at great length and with absolutely devastating effect Hollenbeck's

16

character for untruthfulness. Defense counsel recounted the many lies Hollenbeck had told and the many frauds he had committed throughout his life. In fact, this court has never seen a witness more thoroughly impeached than Hollenbeck. In the face of such blistering impeachment and the other evidence in the trial, one more false statement by Hollenbeck could not have possibly affected the jury's judgment.

United States v. Bartko, No. 5:09-CR-321-D, slip op. at 101-02 (E.D.N.C. Jan. 17, 2012) (citations omitted). Consequently, the district court did not err in refusing to grant to Bartko a new trial on this issue.

C.

In Bartko's second motion for a new trial, he also contends that the government's failure to disclose the agreements between it and Scott and Crystal Hollenbeck amounts to a Brady violation.

As this Court recognized in United States v. Wilson, 624 F.3d 640 (4th Cir. 2010):

In Brady, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S. Ct. 1194. In order to prove that the [g]overnment's failure to tender certain evidence constitutes a Brady violation, the burden rested on [the defendant] to show that the undisclosed evidence was (1) favorable to him either because it is exculpatory, or because it is impeaching; (2) material to the defense, i.e., "prejudice must have ensued"; and (3) that the prosecution had materials and failed to disclose them.

17

> United States v. Stokes, 261 F.3d 496, 502 (4th Cir.
> 2001).

Id. at 660-661. "Evidence is 'exculpatory' and 'favorable' if it 'may make the difference between conviction and acquittal' had it been 'disclosed and used effectively.'" Id. at 661 (quoting United States v. Bagley, 473 U.S. 667, 676 (1985)). And, it is "'material' if it is 'likely to have changed the verdict.'" Id. (quoting Moseley v. Branker, 550 F.3d 312, 318 (4th Cir. 2008)). "It is an abuse of discretion for the district court to commit a legal error—such as improperly determining whether there was a Brady violation—and that underlying legal determination is reviewed de novo." Wilson, 624 F.3d at 661 n.24.

There is no dispute that factors one and three of the test set forth in Stokes are satisfied—namely that the proffer agreements were favorable to Bartko because they were impeaching and that the prosecution had the materials and failed to disclose them. See Stokes, 261 F.3d at 502. Thus, our inquiry here will focus on only the second element: whether the agreements were material to the defense. In other words, was Bartko prejudiced by the non-disclosure? See id.

The district court held that the Hollenbecks' proffer agreements constituted cumulative impeachment evidence. In the alternative, it stated that there is no reasonable probability

18

that the jury's verdict would have been different if the government had disclosed the agreements.

If Bartko had had the Hollenbecks' proffer agreements, he could have used them in an attempt to attack Scott Hollenbeck's credibility. But, as the district court noted, "Bartko's impeachment of Hollenbeck was devastatingly thorough and thoroughly devastating." Bartko, No. 5:09-CR-321-D, slip op. at 103. It encompassed:

> (1) Hollenbeck's felony convictions, (2) his bias in favor of the government due to his desire to receive a Rule 35 motion and a reduction in his 168-month prison sentence for his involvement in Mobile Billboard's fraud, (3) his bias in favor of the government due to his desire to avoid being prosecuted for the fraud that he committed with Colvin, Webb Group, Franklin Asset Exchange, Disciples Trust, and others, (4) his bias in favor of the government due to his desire to avoid being prosecuted for the fraud he committed while raising money for the Caledonian Fund and the Capstone Fund, (5) myriad specific instances of lying, fraud, and forgery throughout Hollenbeck's adult life, (6) prior inconsistent statements to prosecutors, (7) contradictions within his trial testimony, and (8) his inability to recall certain facts.

Bartko, No. 5:09-CR-321-D, slip op. at 107-08. Thus, the proffer agreements would have been cumulative and, as such, we are unable to fathom how the jury's knowing about them could have further damaged Hollenbeck's credibility. The "proffer agreement[s] had nothing to add and would not have shed any new light on the depth of Hollenbeck's wrongdoing, the magnitude of his incentive to cooperate with the government, or the absence

19

of his credibility." Bartko, No. 5:09-CR-321-D, slip op. at 103. Hence, we are confident that there is no reasonable probability that the jury would have reached a different verdict if Bartko had been given and effectively used the Hollenbecks' proffer agreements.

D.

In Bartko's third motion for a new trial, he contends that the government committed a Brady violation in failing to disclose the tolling agreements that it had entered into in 2010 with Levonda Leamon. The agreements tolled the statute of limitations "for potential federal criminal violations regarding Ms. Leamon's involvement in the fraudulent sale of investments during the year 2005, including conspiracy, mail fraud, the sale of unregistered securities, and money laundering." The purpose of the agreements was "to allow additional time for the parties to present facts and discuss the matter . . . [and] to evaluate and discuss potential resolutions to [the] case." The January 5, 2010, agreement tolled the statute of limitations on Leamon's crimes until July 5, 2010; and the July 2, 2010, agreement tolled the statute of limitations until December 5, 2010. It appears from the record that, without these agreements, the statute of limitations on some of Leamon's alleged crimes would have run before she gave her testimony at Bartko's trial.

As already enumerated, we consider three factors in determining whether a Brady violation has occurred: whether the undisclosed evidence was "(1) favorable to [the defendant] either because it is exculpatory, or because it is impeaching; (2) [whether the evidence was] material to the defense, i.e., 'prejudice must have ensued'; and (3) [whether] the prosecution had materials and failed to disclose them." Stokes, 261 F.3d at 502. The government acknowledges that the Leamon agreements are impeaching and that it had the materials but failed to disclose them. Thus, as before, because factors one and three are met, we need focus on only the second factor—the materiality factor.

We "discard[] as immaterial . . . undisclosed impeachment evidence where it was cumulative of evidence of bias or partiality already presented 'and thus would have provided only marginal additional support for [the] defense.'" United States v. Cooper, 654 F.3d 1104, 1120 (10th Cir. 2011) (second alteration in original) (quoting Douglas v. Workman, 560 F.3d 1156, 1174 (10th Cir. 2009)).

"In general, evidence whose function is impeachment may be considered to be material where the witness in question supplied the only evidence linking the defendant to the crime." United States v. Avellino, 136 F.3d 249, 256 (2nd Cir. 1998). Likewise, we may find impeaching evidence to be "material where the witness supplied the only evidence of an essential element

21

of the offense." Id. at 257. "This is especially true where the undisclosed matter would have provided the only significant basis for impeachment." Id..

Leamon testified at trial that she was a seventy-year-old high school graduate and former flight attendant. She became a co-owner of LRM in 2003 or 2004 with her role primarily being community involvement. She also attested to Bartko's use of LRM's office for the January 11, 2005, meeting and how LRM received money from the Capstone Fund, as well as Hollenbeck's other investors, and then sent the money back to Capstone. According to Leamon, she spoke with Hollenbeck and Bartko about pooling the money that came in from investors and the potential round trip of the refund checks as the investors endorsed them to LRM. Leamon also stated that LRM received a six-percent commission from the Capstone Fund.

Leamon further testified about LRM's process of mailing statements and letters to investors, as well as corrected statements and letters, the closing of the account at TriStone Bank and the opening of an account with, as Bartko put it, "a larger bank like a Wachovia."

As the district court noted, "This testimony served primarily as summary evidence of [LRM's] bank activity, mailings, and meetings, which was corroborated by substantial documentary evidence, the testimony of victims, the testimony of

22

Plummer, and the testimony of Bartko." Bartko, No. 5:09-CR-321-D, slip op. at 111. "In short, Bartko's admissions and a mountain of other evidence independently corroborate Leamon's testimony." Id. at 112. As such, Leamon's testimony was not material. And, because it was not material, the district court did not err in its refusal to grant Bartko a new trial on this issue.

E.

Although "courts of necessity examine undisclosed evidence item-by-item, their materiality determinations must evaluate the cumulative effect of all suppressed evidence to determine whether a Brady violation has occurred." United States v. Ellis, 121 F.3d 908, 916 (4th Cir. 1997). When "the net effect of the evidence withheld by the [government] in [a] case raises a reasonable probability that its disclosure would have produced a different result, [the defendant] is entitled to a new trial." Kyles v. Whitley, 514 U.S. 419, 421-22 (1995). "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[] confidence in the outcome of the trial.'" Smith v. Cain, 132 S. Ct. 627, 630 (2012) (quoting Kyles, 514 U.S. at 434).

Here "the likelihood of a different result is [not] great enough to 'undermine[] confidence in the outcome of [Bartko's] trial.'" See id. As the district court aptly noted,

> In so finding, the court stresses that Bartko's case was not a close one. The trial record reveals overwhelming evidence of Bartko's guilt. The jury carefully heard the evidence over a three-week period. The jury received detailed jury instructions. After deliberating approximately four hours, the jury unanimously convicted Bartko on all six counts.
>
> . . . .
>
> Circumstantial this case was; tenuous it absolutely was not. The mountain of evidence marshaled against Bartko demonstrated his guilt beyond any shadow of a doubt. Moreover, if the jury had had any doubts, Bartko's testimony destroyed them. The jury was permitted not only to disbelieve Bartko's testimony, but to believe the opposite.

Bartko, No. 5:09-CR-321-D, slip op. at 118. Therefore, having reviewed the omitted evidence "in the context of the entire record." United States v. Agurs, 427 U.S. 97, 112 (1976), and finding that there is no reasonable probability that the disclosure of the withheld evidence or the correction of Hollenbeck's false testimony could have produced a different result, we conclude that the district court did not err in refusing to grant Bartko a new trial.


F.

Having analyzed the Brady and Giglio issues that Bartko raises, we pause here to address the discovery practices of the

24

United States Attorney's office in the Eastern District of North Carolina.[1]  A cursory review of this Court's opinions reveals recent consideration of at least three cases involving discovery abuse by government counsel in this district.  See, e.g., United States v. Flores-Duran, No. 11-5167, 2013 WL 3286248, *2-4 (4th Cir. July 1, 2013)[2] (noting that (1) "[d]uring the week prior to trial, . . . the [g]overnment sent over one thousand pages of additional discovery, the bulk of which was due no later than fourteen days prior to trial" and that the government argued its "discovery violation" was excusable because it "misread[] . . . the discovery order; a power outage [occurred] at the courthouse in Raleigh; and [it made a] last minute decision to present certain evidence" and (2) that on the Saturday immediately prior to the Monday on which trial was to begin, the government faxed key information obtained approximately twenty-four hours earlier to defense counsel's office, but it did nothing to ensure that counsel received the fax, even though it sent the information

---

[1] We note that the current United States Attorney for the Eastern District of North Carolina did not assume office until 2011, which is after some of the conduct described herein occurred.

[2] We recognize that unpublished cases have no precedential value in this circuit.  We rely on them here not for their legal conclusions, but only to demonstrate that certain conduct has occurred repeatedly.

25

outside of normal business hours); <u>United States v. Burkhardt</u>, 484 F. App'x 801, 802 (4th Cir. 2012) (considering a defendant's appeal of his civil commitment as a sexually dangerous person and citing as a "matter of concern" the government's failure to disclose prior to the commitment hearing that one of the defendant's victims would testify); <u>United States v. King</u>, 628 F.3d 693, 701-04 (4th Cir. 2011) (vacating and remanding the defendant's conviction for felony possession of a firearm because the government "specifically rebuffed both . . . written and oral demands [by the defendant] that it disclose" potentially exculpating grand jury testimony and "refused to disclose" the testimony, even after the district court "suggest[ed] that it do so"). And this case, which confronts us with three alleged constitutional violations—two instances of withholding discoverable evidence and one choice to leave uncorrected a witness's false testimony—only adds to the list.

Mistakes happen. Flawless trials are desirable but rarely attainable. Nevertheless, the frequency of the "flubs" committed by this office raises questions regarding whether the errors are fairly characterized as unintentional. <u>Cf.</u> Oral Argument at 24:50-25:10, <u>Flores-Duran</u>, 2013 WL 3286248 (No. 11-5167), <u>available at</u> http://www.ca4.uscourts.gov/OAaudioop.htm. (referencing the government's late disclosure of pages of discovery in violation of the judge's discovery order and

26

stating, "This is a repeat offense by the government. The order is entered by the court requiring disclosure by a certain date, and the government simply ignores it. And their explanation for ignoring it is, 'I missed it. So what. There's no prejudice.' And it just happens again and again."). Moreover, the government's responses to queries regarding its practices are less than satisfactory. For example, in this case, when asked at oral argument about its failure to correct Scott Hollenbeck's testimonial misstatement regarding promises he had received, the government suggested that at the time Hollenbeck made the misstatement, trial counsel had no recollection of the promises made to him. But as Judge Keenan aptly noted, such an idea "just strains credulity." Oral Argument at 21:54-21:56, United States v. Bartko (No. 12-4298), available at http://www.ca4.uscourts.gov/OAaudiotop.htm. Similarly artless responses have been given in other cases. See, e.g., Oral Argument at 11:20-14:30, Flores-Duran, 2013 WL 3286248 (No. 11-5167), available at http://www.ca4.uscourts.gov/OAaudiotop.htm. And here, when we gave counsel an opportunity to correct her farfetched assertion, she refused. Faced with such behavior, we must conclude that this office is uninterested in placating concerns about its practices.

As detailed above, our confidence in the jury's conviction of Bartko was not undermined by the government's misconduct in

this case.  And such is the result in many cases.  Remedies elude defendants because discovery violations ultimately prove immaterial to the verdict.  But that is not the true problem. The problem is that the government appears to be betting on the probability that reams of condemning evidence will shield defendants' convictions on appeal such that at the trial stage, it can permissibly withhold discoverable materials and ignore false testimony.  Make no mistake, however.  We may find such practices "harmless" as to a specific defendant's verdict, but as to litigants in the Eastern District of North Carolina and our justice system at large, they are anything but harmless. "No [one] in this country is so high that [she or] he is above the law.  No officer of the law may set that law at defiance with impunity.  All the officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it." United States v. Lee, 106 U.S. 196, 220 (1882).  The law of this country promises defendants due process, U.S. Const. amend. V, and the professional code to which attorneys are subject mandates candor to the court, see Model Rules of Prof'l Conduct R. 3.3., and fairness to opposing parties, see id. R. 3.4.  Yet the United States Attorney's office in this district seems unfazed by the fact that discovery abuses violate constitutional guarantees and misrepresentations erode faith that justice is achievable.  Something must be done.

28

We urge the district court in the Eastern District of North Carolina to meet with the United States Attorney's Office of that district to discuss improvement of its discovery procedures so as to prevent the abuses we have referenced here. Moreover, if this sort of behavior continues in subsequent cases, this Court may wish to require that the United States Attorney for the Eastern District of North Carolina, as well as the trial prosecutor, be present at oral argument so that the panel can speak directly to her or him about any alleged misconduct. Sanctions or disciplinary action are also options.

To underscore our seriousness about this matter, and to ensure that the problems are addressed, we direct the Clerk of Court to serve a copy of this opinion upon the Attorney General of the United States and the Office of Professional Responsibility for the Department of Justice. The transmittal letter should call attention to this section of the opinion.

We do not mean to be unduly harsh here. But "there comes a point where this Court should not be ignorant as judges of what we know as men [and women]." Rumsfeld v. Padilla, 542 U.S. 426, 465 n.10 (2004) (Stevens, J., dissenting) (quoting Watts v. Indiana, 338 U.S. 49, 52 (1949)). What we know is that we are repeatedly confronted with charges of discovery abuse by this office. What we know is that our questions regarding this abuse remain unanswered. And what we know is that such conduct is

unacceptable.  Appropriate actions need to be taken to ensure that the serious errors detailed herein are not repeated. Whatever it takes, this behavior must stop.

## III.

Next, Bartko contends that the district court improperly considered an ex parte sealed document submitted by the government.  Bartko had filed a motion asking the district court to unseal the document, but the court denied his motion.

At our request, the government provided to us a copy of the sealed document, which asks the district court to make an in camera review of grand jury testimony in another case to determine whether that testimony contained any Jencks materials. The district court concluded that the sealed document did not, and we agree.  Thus, we need not decide whether the district court erred in considering the document in that it caused no harm to Bartko.

## IV.

Bartko also maintains that the district court erred by not instructing the jury on accomplice/informant testimony and on multiple conspiracies.  A district court's "decision to give (or not to give) a jury instruction . . . [is] reviewed for abuse of discretion."  United States v. Russell, 971 F.2d 1098, 1107 (4th

30

Cir. 1992). A district court's decision not to give a requested instruction by the criminal defendant amounts to reversible error only if the proffered instruction: (1) was correct, (2) was not substantially covered by the charge that the district court actually gave to the jury, and (3) involved some point so important that the failure to give the instruction seriously impaired the defendant's defense. United States v. Lewis, 53 F.3d 29, 32 (4th Cir. 1995). Even if these factors are met, however, failure to give the defendant's requested instruction is not reversible error unless the defendant can show that the record as a whole demonstrates prejudice. See Ellis, 121 F.3d at 923.

### A.

Bartko complains that the district court abused its discretion in its refusal to instruct the jury that it "should consider the testimony of Hollenbeck, Leamon and Plummer with great care and scrutiny." It appears that Bartko asked for an instruction regarding the testimony of an accomplice, informer, or witness with immunity. But, the district court declined and gave the following instruction instead:

> You, as jurors, are the sole and exclusive judges of the credibility of each of the witnesses called to testify in this case, and only you can determine the importance or weight that their testimony deserves. After making your assessment concerning the

31

credibility of a witness, you may decide to believe all of that witness'[s] testimony, only a portion of it, or none of it.

In making your assessment of each witness, you should carefully scrutinize all of the testimony given by each witness, the circumstances under which each witness has testified, and all of the other evidence which tends to show whether a witness, in your opinion, is worthy of belief.

Consider each witness'[s] intelligence, motive to falsify, state of mind, and appearance and manner while on the witness stand. Consider each witness'[s] ability to observe the matters as to which he or she testified and consider whether he or she impresses you as having an accurate memory or recollection of these matters. Consider also any relation each witness may bear to either side of the case, the manner in which each witness might be affected by your verdict, and the extent to which, if at all, each witness is either supported or contradicted by other evidence in the case.

This instruction certainly encompasses any specific instruction that the jury "should consider the testimony of Hollenbeck, Leamon and Plummer with great care and scrutiny." And, as detailed herein, the record fails to support any argument that the three were promised something in exchange for their testimony. Thus, in our judgment, we are unable to say that the district court's decision denying Bartko's request to give an accomplice/informer instruction was an abuse of discretion in that Bartko was not prejudiced by the omission.

32

Bartko also insists that the district court erred in refusing to give his requested multiple conspiracy charge. "A court need only instruct on multiple conspiracies if such an instruction is supported by the facts." United States v. Mills, 995 F.2d 480, 485 (4th Cir. 1993). Hence, "[a] multiple conspiracy instruction is not required unless the proof at trial demonstrates that appellants were involved only in 'separate conspiracies unrelated to the overall conspiracy charged in the indictment.'" United States v. Kennedy, 32 F.3d 876, 884 (4th Cir. 1994) (quoting United States v. Castaneda-Cantu, 20 F.3d 1325, 1333 (5th Cir. 1994)). And, even if one overarching conspiracy is not evident, the district court's failure to give a multiple conspiracies instruction is reversible error only when the defendant suffers substantial prejudice as a result. United States v. Tipton, 90 F.3d 861, 883 (4th Cir. 1996). For us to find such prejudice, "the evidence of multiple conspiracies [must have been] so strong in relation to that of a single conspiracy that the jury probably would have acquitted on the conspiracy count had it been given a cautionary multiple-conspiracy instruction." Id.

Bartko proposed that the district court give the following multiple conspiracy charge:

> You must determine whether the conspiracy charged in the indictment existed, and, if it did, whether the defendant was a member of it. If you find that the conspiracy charged did not exist, then you must return a not guilty verdict, even though you find that some other conspiracy existed. If you find that a defendant was not a member of the conspiracy charged in the indictment, then you must find that defendant not guilty, even though that defendant may have been a member of some other conspiracy.

According to Bartko, "the [g]overnment's evidence, at best, would show that there were two separate and independent conspiracies: the Caledonian Fund and Capstone Fund. . . . There was no testimony that the activities of either fund overlapped or coexisted. The only connection between the Funds was Bartko."

But, "a single overall conspiracy can be distinguished from multiple independent conspiracies based on the overlap in actors, methods, and goals." United States v. Stockton, 349 F.3d 755, 762 (4th Cir. 2003). Here, we have all three. The actors in both conspiracies were the same: Bartko, Franklin Exchange, and Scott Hollenbeck. The methods of investor recruitment and the handling of their money were also the same. And, the goals of raising money for investing and personal gain were the same. Moreover, we are unable to say that "the evidence of multiple conspiracies was so strong in relation to that of a single conspiracy that the jury probably would have acquitted on the conspiracy count had it been given a cautionary

34

multiple-conspiracy instruction." Tipton, 90 F.3d at 883. Hence, we are unconvinced that the district court committed reversible error in its refusal to give a multiple conspiracy charge.

V.

Bartko next complains that the district court improperly imposed Sentencing Guidelines enhancements based on the amount of loss, the number of victims, and his status as a registered broker/dealer at the time of the offenses. When deciding whether the district court properly applied the Guidelines, "we review the court's factual findings for clear error and its legal conclusions de novo." United States v. Allen, 446 F.3d 522, 527 (4th Cir. 2006). The district court's decision concerning a role adjustment is a factual determination, reviewable for clear error. United States v. Kellam, 568 F.3d 125, 147-48 (4th Cir. 2009). "A finding of fact is clearly erroneous when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" In re Mosko, 515 F.3d 319, 324 (4th Cir. 2008) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)).

35

A.

Bartko argues that the district court erred in determining the amount of loss attributed to him. The district court imposed an eighteen-level increase to his base offense level pursuant to U.S.S.G. § 2B1.1(b)(1)(J) (providing an eighteen-level increase for a loss of more than $2,500,000).

But Bartko claims that he should have been able to take advantage of a Guidelines-provided credit against loss for the amount of money he caused to be returned "to the victim[s] before the offense was detected." U.S.S.G. § 2B1.1 cmt. n.3(E)(i). The Guidelines provide, however, that "[t]he time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or a government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency." Id.

First, Bartko contends that none of the refund checks should be counted in the loss amount. But, as detailed above, and as observed by the district court during the sentencing hearing, "the part [of the refund checks] that wasn't embezzled ended up being filtered back through LRM as part of the conspiracy," with the exception of investor Danny Briley, who decided not to endorse his refund check over to LRM. Thus,

36

because the money was not ultimately returned to the investors, the district court did not clearly err on this point.

Second, Bartko avers that the loss amount should be reduced by the money that was returned to the investors through the interpleader. As noted above, the SEC knew of Bartko's offense when Alex Rue, an attorney from that office, met with him on March 14, 2005. But, Bartko did not file his interpleader action until after that, on May 26, 2005. Consequently, he is unable to avail himself of Guidelines-provided credit against loss for the amount of money he caused to be returned "to the victim[s] before the offense was detected." U.S.S.G. § 2B1.1 cmt. n.3(E)(i). Thus, the district court did not err in overruling Bartko's objection to this enhancement.

B.

Bartko also avers that the district court erred by finding that there were more than fifty victims of his crimes. Bartko posits "that none of the money invested in Caledonian should be counted towards [his] loss amount . . . . Therefore, the number of victims is limited to those people who invested in Capstone, which is fewer than 50." The import of this objection is that, under U.S.S.G. § 2B1.1(b)(2)(B), the district court is to impose a four-level enhancement if the offense that the defendant was convicted of "involved 50 or more victims." The commentary

37

accompanying this Guideline provides, in relevant part: "'Victim' means . . . a person who sustained any part of the actual loss determined under subsection (b)(1) [the amount of loss chart]." U.S.S.G. § 2B1.1 cmt. n.1. Neither party disputes that there were at least thirty-nine investors in Capstone. So, we are left to decide if there were at least eleven investors in Caledonian. We think that there were.

As we have already observed, from January 15, 2004, to May 6, 2004, Hollenbeck fraudulently raised large amounts of money from a total of 171 investors for the Caledonian Fund, as well as other investments. The money was not separated, but was comingled. He sent the money to various entities, including the Caledonian Fund, as directed by Colvin.

If one's money is combined with other funds and, as here, $701,000 is lost from the total, then each individual or entity who contributed to the total loses a pro-rata share of her contribution. And, because each of those who contributed "sustained [a] part of the actual loss determined under subsection (b)(1)," id., they are a victim pursuant to U.S.S.G. § 2B1.1(b)(2)(B). Accordingly, the district court did not commit clear error in its refusal to sustain Bartko's objection to the imposition of this enhancement.

C.

Finally, Bartko asserts that the district court erred in imposing an enhancement pursuant to U.S.S.G. § 2B1.1(b)(18)(A) inasmuch as, according to him, he was part-owner of a registered broker-dealer, but it was not used to commit the crime.

Pursuant to U.S.S.G. § 2B1.1(b)(18), "[i]f the offense involved . . . a violation of securities law and, at the time of the offense, the defendant was . . . a registered broker or dealer, or a person associated with a broker or dealer[,] . . . increase by 4 levels." The accompanying comment to this Guideline defines a "registered broker or dealer" as "a broker or dealer registered or required to register." U.S.S.G. § 2B1.1 cmt. n.14(A) (incorporating 15 U.S.C. § 78c(a)(48)).

Without citation, Bartko maintains that "[t]he purpose of this enhancement is not to increase the punishment for anybody who happened to have a broker-dealer license who commits a securities law violation." He is mistaken. The meaning of the Guideline is clear. Under § 2B1.1(b)(18), the district court is to impose a four-level enhancement when a broker or dealer's criminal offense involves a securities law violation. There is no dispute that Bartko was a broker and that his offense involved a securities violation. Thus, the four-level enhancement was proper.

39

D.

The government states that, even if we find any procedural sentencing error in our review, the error is harmless. But, because we find no error in the district court's sentencing of Bartko, we need not engage in a harmless error review.


VI.

For the foregoing reasons, we affirm Bartko's conviction and sentence.

The Clerk of Court shall serve a copy of this opinion upon the Attorney General of the United States and the Office of Professional Responsibility for the Department of Justice. The transmittal letter should call attention to Section II(F) of this opinion.

AFFIRMED

40