**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 13-4989**

---

UNITED STATES OF AMERICA,

              Plaintiff - Appellee,

     v.

JACK WINFRED PARKER,

              Defendant - Appellant.

---

**No. 13-4990**

---

UNITED STATES OF AMERICA,

              Plaintiff - Appellee,

     v.

DOUGLAS E. TAYLOR,

              Defendant - Appellant.

---

Appeals from the United States District Court for the District of South Carolina, at Columbia.   Cameron McGowan Currie, Senior District Judge.  (3:13-cr-00133-CMC-2; 3:13-cr-00133-CMC-3)

---

Argued:  March 27, 2015          Decided:  June 25, 2015

---

Before DUNCAN, KEENAN, and THACKER, Circuit Judges.

---

Vacated and remanded by published opinion. Judge Keenan wrote the opinion, in which Judge Duncan and Judge Thacker joined.

––––––––––––––

**ARGUED:** Joshua Snow Kendrick, KENDRICK & LEONARD, P.C., Greenville, South Carolina, for Appellants. Julius Ness Richardson, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee. **ON BRIEF:** Christopher S. Leonard, KENDRICK & LEONARD, P.C., Greenville, South Carolina, for Appellants. William N. Nettles, United States Attorney, Winston D. Holliday, Jr., Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee.

––––––––––––––

BARBARA MILANO KEENAN, Circuit Judge:

Jack Parker and Douglas Taylor (collectively, the defendants) appeal their convictions for engaging in illegal gambling, in violation of 18 U.S.C. § 1955. This appeal primarily presents the question whether prosecutors' failure to disclose certain impeachment evidence, despite knowing of such evidence before trial, violated the constitutional protections articulated in Brady v. Maryland, 373 U.S. 83 (1963).

The central contested issue during the jury trial was the sufficiency of the evidence to satisfy the statutory requirement that the gambling operation involve at least five persons. The government advanced several theories regarding the identity of the "fifth participant" in the gambling business, including that Jack Parker's daughter-in-law, Tammy Parker, participated in the enterprise by maintaining financial and tax records of gambling proceeds.

The defendants argue on appeal that the government violated Brady by failing to disclose certain impeachment information regarding Ben Staples, a government witness who testified about Tammy Parker's involvement in the gambling operation. Upon our review, we conclude that the government violated its obligations under Brady and, accordingly, we vacate the defendants' convictions and remand their cases to the district court.

3

I.

Jack Parker, his son, Brett Parker, and Douglas Taylor[1] were tried in the district court for participating in an illegal gambling business involving at least five participants, in violation of 18 U.S.C. § 1955. All three defendants were convicted following a three-day jury trial, although only Jack and Douglas have filed this appeal from their convictions.[2]

A.

We begin by describing the statute under which the defendants were convicted, 18 U.S.C. § 1955, which prohibits the acts of "conduct[ing], financ[ing], manag[ing], supervis[ing], direct[ing], or own[ing] all or part of an illegal gambling business." 18 U.S.C. § 1955(a). An "illegal gambling business" is defined as a gambling business that: (1) is operated in violation of applicable state or local law; (2) "involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business" (the five-participant requirement); and (3) "has been or remains in substantially continuous operation for a period in excess of thirty days or

_____

[1] Because Jack, Brett, and Tammy Parker share a last name, we will refer to all the defendants by their first names in this opinion.

[2] In addition to the federal gambling conviction, Brett was convicted in a South Carolina state court of murdering his wife, Tammy, and his business partner, Bryan Capnerhurst. Brett was sentenced to two terms of life imprisonment for these murders.

4

has a gross revenue of $2,000 in any single day." Id. § 1955(b).

Congress imposed the above size and duration limitations in Section 1955 "as a means of screening out those gambling businesses that are too insignificant to warrant federal action." United States v. Gresko, 632 F.2d 1128, 1132 (4th Cir. 1980). When attempting to prove the five-participant requirement, the government need not show that the same five participants were involved in the business for all thirty days; "[h]owever, there must be evidence that the business involved at least five people at all times for thirty days." Id. at 1132-33. Accordingly, a jury considering the five-participant requirement may reach a guilty verdict under Section 1955 so long "[a]s each member of the jury agrees that some five persons were involved at all times over some thirty-day period or on any one single day in which the gross revenues exceeded $2,000." United States v. Nicolaou, 180 F.3d 565, 571 (4th Cir. 1999) (emphasis in original).

B.

The defendants stipulated at trial that they engaged in "bookmaking" in violation of South Carolina law. Therefore, the government's evidence focused on the five-participant requirement of Section 1955. The government sought to prove that the business operated by Jack and Douglas was linked to

5

another two-person gambling enterprise operated by Brett, and that this joint enterprise also included a fifth participant.

The defendants stipulated that Jack and Douglas engaged in a sports gambling business together, and further stipulated that Brett worked with a fourth man, Bryan Capnerhurst, also in a sports gambling business. In the course of these gambling operations, customers placed telephone calls or sent text messages to the defendants to place bets on the outcome of certain collegiate and professional sporting events. Brett, Bryan, Jack, and Douglas thus acted as "bookmakers," or "bookies," and received a ten percent surcharge on bets their customers lost as well as the net value of their customers' losses minus their wins.

Although these gambling operations often were conducted as separate enterprises, the evidence also showed that Jack and Douglas periodically answered the telephone line that Brett and Bryan used for accepting bets, and vice versa. Beginning in February 2012, Jack and Douglas transferred to Brett and Bryan telephone calls received from customers who wished to place bets on NCAA basketball games. The proceeds or losses from these shared clients were distributed among the four bookmakers. The government argued from this evidence that Brett, Bryan, Jack, and Douglas all participated in the same gambling business (the

gambling business) during the time period alleged in the indictment.

To satisfy the five-participant requirement of Section 1955, the government offered evidence regarding several additional individuals linked to the gambling business through Brett. The government first sought to prove that Brett's wife, Tammy, not only was aware of her husband's gambling business, but also participated in the business by directing the use of Brett's gambling income for family expenses and by maintaining the family's financial records. In support of this theory, the government presented the testimony of Ben Staples, a family friend, who stated that he assisted Tammy in preparing joint federal tax returns in which she disclosed Brett's income from the gambling business.

Through Staples's testimony, the government introduced Tammy's handwritten notes regarding the family's budget and finances. Tammy included several references to gambling proceeds in these notes, including sums of money held in a "booking fund" and the share of profits from the gambling business that were due to Bryan.[3] She also indicated in her notes some plans she had for distributing gambling proceeds,

---

[3] A law enforcement investigator testified that Brett designated the booking fund as a cash reserve for use in the event that he incurred significant gambling losses.

such as one note stating, "use deposits from booking to pay for equity line."

Aside from Staples's testimony and Tammy's notes, the government offered two other items of evidence regarding Tammy's involvement in the gambling business. First, during a search of Brett's and Tammy's home after her death, law enforcement agents recovered from Tammy's desk an envelope with the words "Booking Fund-$20,000" written on the envelope. This envelope was introduced as an exhibit at trial. Second, Harold Saxby, one of Brett's gambling customers, testified that when Brett was not at home, Tammy periodically accepted envelopes containing money for bets. The government asserted that this collective evidence supported the conclusion that Tammy was the fifth participant in the gambling business.

The government also argued that certain individuals who worked as "layoff bookies" each could have constituted the fifth participant in the gambling business. See United States v. Jenkins, 649 F.2d 273, 275 (4th Cir. 1981) (explaining circumstances under which a layoff bookie can be considered a participant in a gambling business). "Lay off betting" occurs when a bookmaker "passes on to another bookmaker [i.e., a 'layoff bookie'] the amount of bets by which his own 'book' is unbalanced; thus to the extent he loses to his own customers, he wins back from the other bookmaker, or vice versa." United

States v. Thomas, 508 F.2d 1200, 1202 n.2 (8th Cir. 1975). Layoff betting is therefore a type of insurance for bookmakers to protect against losses to their own customers. Id.

Several witnesses testified about Brett's participation in layoff betting and his association with layoff bookies. An officer investigating the present case testified that Brett had admitted having engaged a layoff bookie named Ron Spence. Also, in recorded conversations with Staples and Jack, Brett had discussed his practice of laying off bets.

Government witness Harry Benenhaley, another bookmaker, testified that Brett's conduct of placing bets with Benenhaley was "consistent with" the practice of laying off bets. However, Benenhaley also stated that he eventually suspected that Brett was using the purported layoff account to place personal bets on his own behalf. The government nevertheless asserted that the evidence regarding Brett's layoff betting supported a finding that one of the layoff bookies was a fifth participant in the gambling business.

Finally, the government offered evidence that Brett received "lines" from another bookmaker, Vincent Sanford, that could render Sanford a fifth participant in the gambling business. A "line" "constitutes the 'odds' or 'handicaps' or 'point spreads' on the wagered contests," and includes "a list of the teams and events with a certain number of points

9

attributed to the nonfavored team. To win a bet on the favored team . . . that team must win by a score exceeding the point spread given to the nonfavored team." United States v. George, 568 F.2d 1064, 1067 n.4 (4th Cir. 1978) (quoting Thomas, 508 F.2d at 1202).

Sanford testified that he provided Brett with lines on a daily basis during a three-year period between 2009 and 2012, and suggested that these lines assisted Brett in placing his personal bets. After receiving Sanford's lines, Brett frequently placed such personal bets with Sanford. The record does not indicate whether Brett used Sanford's lines in the gambling business. However, bookies may cooperate with each other in order to set consistent lines and to prevent bettors from winning on competing teams. See id. at 1067 n.7, 1069-70. In this case, the government sought to prove a link connecting Sanford to Brett's gambling business by eliciting the above evidence of Sanford's sharing of information.

## C.

The jury trial began on Monday, September 16, 2013. On the preceding Friday, September 13, 2013, Staples advised the prosecution team from the United States Attorney's Office for the District of South Carolina that the Utah office of the Securities and Exchange Commission (SEC) was actively investigating him for fraud. The prosecution team did not

10

disclose its knowledge of this investigation to the defendants' attorneys. When the government presented Staples's testimony on Tuesday, September 17, 2013, the defendants' counsel did not cross-examine him.

Also on Tuesday, September 17, 2013, an attorney in the civil division of the same United States Attorney's Office that was prosecuting the defendants (the civil division) received a draft civil complaint from the SEC identifying Staples as a defendant. The complaint was to be filed in the district court in South Carolina, with the United States Attorney's Office for the District of South Carolina acting as local counsel. In the complaint, the government alleged that Staples had engaged in "fraudulent conduct . . . designed to profit from the deaths of terminally ill individuals." Staples allegedly purchased on these individuals' behalf discounted corporate bonds containing a survivor's option, which option Staples fraudulently redeemed at full value for his own benefit upon the death of each client. Staples allegedly obtained profits of at least $6.5 million as a result of this scheme.

One day after the civil division received the complaint, on Wednesday, September 18, 2013, the jury in the defendants' case began its deliberations, and returned guilty verdicts the same day against Jack, Brett, and Douglas. Also on that day, the chief attorney of the civil division read a newspaper article

11

about Staples's testimony in the present case, and contacted the Utah office of the SEC to determine whether Staples was the same person who was the subject of the SEC complaint. However, the record does not show whether, or in what manner, the SEC responded to this request for information.

On Friday, September 20, 2013, two days after the jury returned the guilty verdicts, an attorney in the civil division filed the SEC complaint in the district court. After the complaint was filed, an attorney in that division discussed the contents of the complaint with the prosecutors in this case.

On Tuesday, September 24, 2013, after defense counsel learned of the SEC complaint, the defendants requested a new trial based on the government's failure to disclose the impeachment evidence involving the SEC investigation, which the defendants contended was material to the jury's verdict. In assessing the defendants' Brady claim, the district court assumed that the prosecutors knew during the trial that Staples was being investigated by the SEC, and that there was a pending civil complaint. Although the court found that the defendants did not know about the SEC investigation, the court concluded that a Brady violation had not occurred because evidence of the SEC investigation was not material to the jury's determination of the defendants' guilt. Thus, the district court found that the defendants had failed to show that there was a reasonable

12

probability of a different result had they been informed in a timely manner of the SEC investigation.

The district court reasoned that although Staples's testimony helped to establish Tammy's involvement in the gambling business, "the Government's case did not depend on Tammy Parker being the fifth participant." The court further explained that Staples's testimony was limited to authenticating Tammy's notes and the audio recordings and to matters that largely were not in dispute, and that, therefore, an attack on Staples's credibility was unlikely to have had an impact on the jury verdict. The court accordingly denied the defendants' motions for a new trial, and this appeal followed.

## II.

The defendants argue that the district court erred in denying their motions for a new trial based on the government's failure to disclose its knowledge of the active SEC investigation, in violation of Brady. The defendants assert that the SEC investigation was material to the outcome of the trial, because the jury could have found that Tammy was the fifth participant based primarily on Staples's testimony linking her to the gambling business.

In response, the government contends that its failure to disclose information about the ongoing SEC investigation did not

13

result in a Brady violation because: (1) the fraud investigation conducted by the SEC was not proper impeachment evidence under Federal Rule of Evidence 608(b); (2) Staples provided only "limited" and "uncontroversial" testimony; (3) the defendants already had knowledge of Staples's business practices underlying the SEC complaint; and (4) the prosecution team did not have a duty to "uncover" an investigation conducted by another government agency. We disagree with the government's arguments.

We review the district court's denial of a motion for a new trial for abuse of discretion. United States v. Stokes, 261 F.3d 496, 502 (4th Cir. 2001). A district court abuses its discretion when it commits a legal error in determining whether a Brady violation has occurred; we therefore review the district court's Brady ruling de novo. United States v. Bartko, 728 F.3d 327, 338 (4th Cir. 2013). In conducting this de novo analysis, we review the district court's accompanying factual findings for clear error. United States v. King, 628 F.3d 693, 702 (4th Cir. 2011).

Under the Supreme Court's decision in Brady, "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. To establish a Brady violation, a defendant must show (1) that

14

the undisclosed information was favorable, either because it was exculpatory or because it was impeaching; (2) that the information was material; and (3) that the prosecution knew about the evidence and failed to disclose it. United States v. Wilson, 624 F.3d 640, 661 (4th Cir. 2010); see also Giglio v. United States, 405 U.S. 150, 153-54 (1972) (explaining that material impeachment information is encompassed within the Brady rule).

Evidence is material if there is a "reasonable probability that its disclosure would have produced a different result." Bartko, 728 F.3d at 340 (citation omitted). This standard does not require a showing that a jury more likely than not would have returned a different verdict. Id. Rather, the "reasonable probability" standard is satisfied if "the likelihood of a different result is great enough to undermine confidence in the outcome of the trial." Id. (citation and internal quotation marks omitted). And, in particular, impeachment evidence may be material when the witness in question "supplied the only evidence of an essential element of the offense," especially if the undisclosed evidence was the only significant impeachment material. Id. at 339 (citation omitted). In contrast, impeachment evidence is not material if it is "cumulative of evidence of bias or partiality already presented and thus would

have provided only marginal additional support for the defense." Id. (citation, internal quotation marks, and brackets omitted).

Initially, we conclude that the ongoing nature of the SEC investigation was admissible, favorable impeachment evidence. If the defendants had been able to cross-examine Staples about the SEC investigation, they could have impeached Staples's credibility in two ways. First, such evidence would have demonstrated Staples's potential bias in testifying as a government witness when he knew that a significant federal investigation was pending against him. "[T]he exposure of a witness' motivation in testifying is a proper and important function" of cross-examination. United States v. Ambers, 85 F.3d 173, 176 (4th Cir. 1996) (quoting Davis v. Alaska, 415 U.S. 308, 316-17 (1974)). As the Supreme Court observed in United States v. Abel, 469 U.S. 45 (1984), an effective showing of bias held by a witness "would have a tendency to make the facts to which he testified less probable in the eyes of the jury than it would be without such testimony." Id. at 51.

Second, questions regarding the SEC fraud investigation could have been used under Federal Rule of Evidence 608(b) to show Staples's general character for untruthfulness. Under Rule 608(b), "specific instances of a witness's conduct" may be the subject of cross-examination if such instances "are probative of

16

the character for truthfulness or untruthfulness of [] the witness." Fed. R. Evid. 608(b).

Fraudulent conduct is an "instance[] of misconduct . . . clearly probative of truthfulness or untruthfulness" and such evidence is admissible under Rule 608(b). United States v. Leake, 642 F.2d 715, 718-19 (4th Cir. 1981). Although the allegations in the SEC complaint had not yet been proven at the time of the defendants' trial, the alleged conduct underlying the SEC complaint and the government's pursuit of a fraud investigation against Staples unquestionably were probative of Staples's character for untruthfulness under Rule 608(b). Therefore, evidence of the ongoing SEC investigation was favorable impeachment information under the first prong of Brady.[4]  See Wilson, 624 F.3d at 661.

We next conclude that evidence of the SEC investigation was material under the standard articulated in Brady, and under decisions applying the Brady rule. As we already have noted, for the jury to have convicted the defendants under Section 1955, it was not necessary that all twelve jurors agree on the identity of the fifth participant. See Nicolaou, 180 F.3d at 571.  The jury could have reached a guilty verdict against the

---

[4] We observe that, in its consideration of the defendants' motions for a new trial, the district court noted that it would have permitted limited cross-examination regarding the SEC investigation.

17

defendants if only one juror had based her determination of guilt on a finding that Tammy was the fifth participant in the business, and the remaining eleven jurors had concluded instead that a layoff bookie was the fifth participant.

The verdict form did not ask the jurors to specify the identities of the participants in the gambling business and, thus, we do not know whether any juror relied on Tammy's involvement in the gambling business to satisfy the five-participant requirement. However, in light of the relative strength of the government's theories, we conclude that there is a reasonable probability that at least one juror would have viewed Tammy as the fifth participant.

The government depicted Tammy as the only purported fifth participant who had a role in managing money made in the gambling business. Tammy's payment of taxes on gambling income illustrated her detailed knowledge of and direct involvement in the gambling business' finances. Tammy also physically accepted payments from one of Brett's customers, accounted for the "booking fund," set aside the share of profits owed to Bryan, Brett's employee in the gambling business, and directed the use of gambling proceeds for household expenses. These facts constituted sufficient evidence from which the jury could have concluded that Tammy was a fifth participant in the gambling

18

business based on her role in actively managing the business' proceeds.

We further observe that the government's evidence supporting the layoff bookie theory was no stronger than the evidence supporting Tammy's involvement. While the evidence regarding Brett's use of layoff bookies involved the testimony of several witnesses, this evidence was general and cumulative in nature. Although the jury could have inferred from this evidence that Brett engaged in layoff betting during the time period alleged in the indictment, the government's evidence supporting this theory was far from overwhelming, and was not sufficiently strong to permit us to conclude that all twelve jurors convicted the defendants on this theory regarding the fifth participant.

The government's evidence concerning Sanford's involvement in the gambling business, which involved providing "lines" to Brett, was even less substantial than the evidence supporting the layoff bookie theory. Sanford testified that he was not concerned with other bookmakers' lines, and suggested that he sent lines to Brett in order to facilitate Brett's personal betting. Although the government contends otherwise, Sanford's testimony could only support the conclusion that Brett used the lines to place his own personal bets with Sanford.

Upon review of this evidence supporting each of the three theories advanced by the government, we conclude that there is a reasonable probability that at least one juror would have rejected the government's theories with respect to the layoff bookies and Sanford, and found that Tammy was the only fifth participant in the gambling business.[5] Accordingly, in considering the materiality prong of Brady, we must determine whether the ability to impeach Staples's testimony would have had a reasonable probability of changing a single juror's view regarding Tammy's involvement in the gambling enterprise.

Aside from Staples's testimony, the government presented only minimal evidence of Tammy's involvement in the gambling operation. The only other evidence linking Tammy to the business was her periodic acceptance of envelopes containing betting payments when Brett was not at home, and the "booking fund" envelope that was found on her desk after her death. Although a jury could have concluded from this additional evidence that Tammy physically handled betting funds, Staples's testimony, if believed, affirmatively established that Tammy

---

[5] We also observe that during its deliberations, the jury submitted to the court a question concerning whether all jurors must unanimously agree on the identity of the fifth participant. This jury question, although not definitive in any respect, provides additional support for a conclusion that there is a reasonable probability that at least one member of the jury relied on Tammy's involvement to satisfy the five-participant requirement.

actively managed the gambling proceeds as part of the family's budget and paid taxes on gambling income on Brett's behalf. Staples's testimony therefore supplied critical evidence in support of the government's theory that Tammy acted as a fifth participant in the gambling business. Moreover, such testimony was particularly significant because no evidence directly linked Tammy to the gambling business conducted by Jack and Douglas.

The evidence in the present case thus stands in stark contrast to the evidence in Bartko, in which we identified an egregious pattern of Brady violations by the government, but concluded that these failures were not material due to the strength of the government's case and the defendant's already extensive impeachment of a key government witness. 728 F.3d at 337-40. Here, however, defense counsel did not even attempt to cross-examine Staples in the absence of available impeachment evidence concerning Staples's fraudulent activities.[6]

Additionally, in Bartko, we emphasized that the government had presented "overwhelming" evidence of Bartko's guilt "beyond

---

[6] The government contends that defense counsel could have cross-examined Staples regarding his past romantic relationship with Tammy, even though Staples already had admitted the fact of the relationship on direct examination. This argument, however, misses the point that evidence of an active federal fraud investigation of Staples's activities involving terminally ill victims would have been far more damaging to Staples's credibility than his romantic liaison with a deceased acquaintance.

21

any shadow of a doubt." Id. at 340 (agreeing with these conclusions reached by the district court). In contrast, the government in the present case pieced together various different theories regarding the identity of the fifth participant, none of which was supported by overwhelming evidence.

We therefore disagree with the government's characterization of Staples's testimony as being of "limited" effect. By authenticating Tammy's handwriting and her budget notes for the jury, Staples's testimony provided the only direct evidence of Tammy's active management of gambling proceeds, as opposed to mere knowledge of Brett's role in the gambling business. And because the government did not offer into evidence the actual tax returns on which Tammy listed the gambling income, Staples's testimony was the only evidence establishing that Tammy completed those tax forms.

If the defendants had been able to ask Staples about whether his testimony was influenced by a desire to receive favorable treatment from the government in the fraud investigation, and about his alleged involvement in the major fraud scheme, the defendants could have undermined further the limited evidence presented by the government that Tammy was the

fifth participant in the gambling business.[7]  For these reasons, we conclude that the prosecutors violated their obligations under <u>Brady</u> when they failed to disclose impeachment evidence of the SEC investigation to defense counsel, and that this impeachment evidence was material to the outcome of the trial.

Our conclusion is not altered by the government's contention that it was not required to disclose information about the SEC investigation because the defendants already were aware of Staples's conduct underlying the SEC complaint.  In making this assertion, the government principally relies on a recorded conversation between Brett and Jack in which Brett stated that he thought that Staples was engaged in a "scam" involving elderly people, and that "<u>if</u> they investigate [Staples] he won't want to get on the stand with nothing [because] his credibility is sh*t" (emphasis added).  The government further asserts that Jack informed a Secret Service agent working on the federal gambling investigation that Staples was being investigated for certain "questionable business practices."

---

[7] We disagree with the government's argument that evidence of the SEC investigation is not material because Staples would have denied engaging in fraud if asked during cross-examination. Staples had admitted to the prosecution team that he was aware of the SEC investigation, which knowledge itself would have called into question Staples's motivation for testifying on behalf of the government.

We examine this issue under the established principle that when "exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the Brady doctrine." United States v. Jeffers, 570 F.3d 557, 573 (4th Cir. 2009) (quoting United States v. Wilson, 901 F.2d 378, 381 (4th Cir. 1990)). Thus, a Brady violation has not occurred if the defense is aware, or should have been aware, of impeachment evidence in time to use it in a reasonable and effective manner at trial. Id.

After considering the government's evidence, the district court found that although Brett and Jack "may have thought Staples had stolen from elderly or sick people," neither Jack, Douglas, nor Brett knew about the nature of the fraud, the active SEC investigation, or the imminent SEC complaint. The government has failed to identify anything in the record to show that the district court clearly erred in this determination. See King, 628 F.3d at 702. Moreover, even if the defendants were aware of Staples's alleged "questionable business practices," the impeachment value of such information would have been far less than the value of showing that Staples was the subject of an imminent civil fraud action and may have been testifying in an effort to receive favorable treatment from the government. Thus, the proffered evidence of Brett's and Jack's

24

knowledge did not relieve the government of its disclosure obligations.[8]

We likewise disagree with the defendants' contention that the evidence was insufficient to support their convictions. In evaluating a challenge to the sufficiency of the evidence, we must determine whether a reasonable fact finder could have accepted the evidence "as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt," viewing the evidence in the light most favorable to the government. United States v. Cornell, 780 F.3d 616, 630 (4th Cir. 2015) (quotation marks and citations omitted).

As we already have observed, the sole disputed element of the crime was whether there were five participants in the gambling business for the required time period. Although Section 1955 requires that an illegal gambling business

_____

[8] We similarly are unpersuaded by the government's argument that its disclosure obligations were not triggered because the prosecution team was unaware before trial of the imminent civil complaint initiated by the SEC and filed by a different division of the United States Attorney's Office in South Carolina. The government contends that the prosecution team did not have to uncover impeachment information held by other government agencies. See Kyles v. Whitley, 514 U.S. 419, 437 (1995) ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case.") (emphasis added). We need not consider whether this distinction advocated by the government has any merit, in light of the prosecution team's admission that Staples personally had advised the prosecutors about the active SEC investigation three days before trial.

25

"involve[] five or more persons" who engage in certain business-related activities, the jurors need not reach a unanimous agreement regarding which five persons comprised the gambling business.  See Nicolaou, 180 F.3d at 571.  In other words, the disputed element of Section 1955 on which the jury must be unanimous is the size of the gambling operation, not the "particular set of facts" underlying the five-participant element.  Id.; see also Schad v. Arizona, 501 U.S. 624, 631–32 (1991) (explaining that jurors returning a general verdict need not agree on a single means of commission of the crime) (plurality opinion); United States v. Griggs, 569 F.3d 341, 343 (7th Cir. 2009) ("The law distinguishes between the elements of a crime, as to which the jury must be unanimous, and the means by which the crime is committed.").  As the Supreme Court explained in Griffin v. United States, we will not overturn a jury's guilty verdict merely because the jury had the "option of relying upon a factually inadequate theory" proffered by the government, so long as "there existed alternative grounds for which the evidence was sufficient."  502 U.S. 46, 59-60 (1991) (citation omitted).

We therefore must determine whether the government presented sufficient evidence to support one of its theories regarding the fifth participant.  We initially hold that the government offered sufficient evidence for the jury to find that

26

Brett, Jack, Douglas, and Bryan worked together in a single gambling business. The evidence, construed in the light most favorable to the government, showed that the bookmakers from each business periodically answered the telephone lines the other business used to accept bets, and that the two operations shared clients beginning in February 2012. In addition, as we explained in our Brady analysis, the evidence was sufficient to support a jury finding that Tammy was a fifth participant. Although the government's case was not overwhelming, the evidence viewed in the light most favorable to the government formed a sufficient basis for the defendants' convictions.[9] We therefore do not enter judgments of acquittal, but vacate the defendants' convictions based on the government's Brady violation and remand the cases to the district court.

---

[9] The defendants additionally argue that Tammy's notes are inadmissible hearsay and should have been excluded from the trial. We disagree. The notes were not "offer[ed] . . . to prove the truth of the matter asserted" such as, for example, the value of the money actually held in the booking fund. See Fed. R. Evid. 801(c). Rather, the government offered the notes to illustrate Tammy's knowledge of and participation in the gambling business. Because the notes are not hearsay, the district court did not abuse its discretion in admitting them.

27

III.

Accordingly, we vacate the convictions of Jack Parker and Douglas Taylor.  We remand their cases to the district court for further proceedings consistent with this opinion.

<u>VACATED AND REMANDED</u>