DILLON, Judge.
 

 *92
 
 Defendants Barshiri Sandy ("Sandy") and Henry Surpris ("Surpris") (collectively referred to as "Defendants") were indicted for various
 
 *93
 
 charges for allegedly robbing Marcus Smith ("Mr. Smith") at gunpoint in Mr. Smith's garage. Defendants were tried together, and the jury returned guilty verdicts on three felony charges. Defendants gave notice of appeal. While their appeals were pending before this Court, Defendants filed motions for appropriate relief ("MARs"). In their MARs, Defendants ask this Court to vacate the judgments, contending that their constitutional rights were violated during the prosecution of their cases. We grant Defendants' MARs and order that the judgments entered against them be vacated, we dismiss Defendants' underlying appeal as moot, and we remand the matters to the trial court for further proceedings consistent with this opinion.
 

 I. Background
 

 A. The "Armed Robbery"
 

 In April 2013, the two Defendants, along with Bryant Baldwin ("Mr. Baldwin"), approached Marcus Smith in his garage as he was exiting his car. During the encounter, the following occurred: (1) Defendants obtained $1,153.00 and a ring from Mr. Smith; (2) Mr. Smith grabbed a gun and shot both Defendants; (3) Mr. Smith was shot in the arm by one of the Defendants; and (4) Defendants fled in a car driven by Mr. Baldwin.
 

 Defendants and Mr. Baldwin were subsequently arrested. Though Mr. Baldwin initially stated he was not present during the shooting, he changed his story and agreed to testify against Defendants after being confronted with certain evidence that placed him at the scene.
 

 B. The Trial
 

 In October 2014, Defendants were jointly tried for a number of felonies in connection with the alleged robbery/shooting in Mr. Smith's garage. All four men who were at the scene on the night in question testified at the trial: Mr. Baldwin and Mr. Smith testified for the State, and Defendants testified on their own behalf.
 

 The State's evidence tended to show as follows: Defendants entered Mr. Smith's garage
 
 with the intent to rob Mr. Smith.
 
 Mr. Smith testified that he was a "club promoter," a position that required him to carry cash which accounted for the large amount of money he carried from time to time. He testified that Defendants approached him in
 
 *203
 
 his garage wearing masks and robbed him of $1,153.00 and some jewelry. He stated that he was able to shoot Defendants during the robbery, but was struck once in the arm by a bullet fired by one of the Defendants. Mr. Smith denied
 
 *94
 
 being a drug dealer. Mr. Baldwin's testimony essentially corroborated Mr. Smith's account of the robbery.
 

 Defendants' evidence tended to show as follows: Defendants testified that Mr. Smith was, in fact, an active drug dealer. Defendants went to see Mr. Smith, not to rob him, but rather
 
 to confront him
 
 about marijuana they claimed they had purchased from him but had not yet received. Mr. Smith admitted to owing Defendants marijuana. Mr. Smith stated that he did not want to conduct business inside his residence (as his family was inside), but that he would give them $1,153.00 in cash and a ring in lieu of the marijuana owed to Defendants. After handing over the money and ring, Mr. Smith grabbed a gun and shot both Defendants. Defendants fled in a vehicle driven by Mr. Baldwin. Defendants presented no evidence that Mr. Smith was, in fact, a major marijuana dealer besides their own self-serving testimony.
 

 Defendants were convicted of all charges. The trial court entered judgments and sentenced them accordingly.
 

 C. The Appeal/Motions for Appropriate Relief
 

 Defendants timely appealed their convictions to this Court. In February 2015, before this appeal was heard, the State's key witness, Mr. Smith, was indicted by the federal government for trafficking large amounts of marijuana. Mr. Smith's indictment was based largely on evidence uncovered during an ongoing investigation by the Raleigh Police Department (the "RPD"). Through information obtained during the federal prosecution of Mr. Smith, Defendants' counsel has learned of information which suggests that
 
 prior
 
 to Defendants' trial: (1) The lead assistant district attorney (the "ADA") in Defendants' case was fully aware of the RPD investigation of Mr. Smith's drug trafficking activities; (2) the ADA corresponded with the lead RPD detective through a private e-mail account she maintained regarding the RPD's active investigation of Mr. Smith's involvement in drug trafficking; (3) when the RPD detective had cause to arrest Mr. Smith for drug trafficking, the ADA encouraged the RPD detective to hold off on the arrest until after she had completed her prosecution of Defendants; and (4) during Defendants' trial, the ADA called Mr. Smith as her key witness, who testified that he was not a drug trafficker, testimony which the ADA knew or should have known was false.
 

 Defendants have filed MARs with this Court pursuant to N.C. Gen.Stat. § 15A-1418, requesting that their convictions be vacated. Their MARs are based, in large part, on information outside the Record on Appeal (the "Record"), including information contained in the court
 
 *95
 
 filings in the federal prosecution of Mr. Smith. As indicated in Defendant Surpris's MAR:
 

 Defense and State witnesses gave drastically different accounts of the events of 17 April 2013. The key issue producing these radically dissimilar accounts was whether Marcus Smith [the victim and the State's key witness] trafficked large amounts of marijuana. The defense argued he did. The State argued he did not.
 

 The defense was correct, but did not have the direct evidence to prove it because the State suppressed substantial evidence documenting Marcus Smith's marijuana trafficking. The State, on the other hand, knew Smith trafficked marijuana, but allowed Smith to falsely tell the jury he made money legitimately as a club promoter.
 

 Defendants argue that they were denied constitutional due process based, in part, on the ADA's failure to disclose evidence of Mr. Smith's drug trafficking activities during discovery,
 
 see
 

 Brady v. Maryland,
 

 373 U.S. 83
 
 ,
 
 83 S.Ct. 1194
 
 ,
 
 10 L.Ed.2d 215
 
 (1963), and the ADA's failure to act when the State's key witness, Mr. Smith, gave testimony at Defendants' trial that he was not involved in drug dealing, testimony the ADA knew or should have known was misleading or false.
 
 See
 

 Napue v. Illinois,
 

 360 U.S. 264
 
 ,
 
 79 S.Ct. 1173
 
 ,
 
 3 L.Ed.2d 1217
 
 (1959).
 

 *204
 
 II. Summary of Holding
 

 In disposing of the MARs, we invoke Rule 2 of the North Carolina Rules of Appellate Procedure to consider certain e-mail communications outside the Record in order to prevent manifest injustice as the "substantial rights of an appellant are affected."
 
 State v. Hart,
 

 361 N.C. 309
 
 , 316,
 
 644 S.E.2d 201
 
 , 205 (2007). Specifically, in our consideration of the MARs, we look not only to the Record but also to certain e-mails between the ADA and the RPD detective and an e-mail communication from the ADA to Defendants' counsel. We note that the State has not disputed the authenticity of these e-mails or made any argument that an evidentiary hearing is necessary to determine the authenticity of these e-mails. Accordingly, we conclude that invocation of Rule 2 is appropriate in this case.
 
 [1]
 

 *96
 
 We further hold that these e-mails and the Record are sufficient for our Court to conclude that Defendants are entitled to the relief they seek in the MARs. Specifically, it is clear that their constitutional rights were violated, at the very least by the ADA's failure to provide information which Defendants could use to make their own case and impeach Mr. Smith's testimony, namely, his assertions that he was
 
 not
 
 a drug dealer. Accordingly, we vacate the judgments against Defendants and remand the matters to the trial court for further proceedings consistent with this opinion.
 

 III. Discussion
 

 A. Legal Grounds for Defendants' MARs:
 
 Brady
 
 and
 
 Napue
 
 Violations
 

 In the present case, Defendants argue the following: (1) the ADA had reason to know that Mr. Smith was active in dealing marijuana (as asserted by Defendants during the trial); (2) the ADA, whether intentionally or unintentionally, suppressed evidence concerning Mr. Smith's drug activities (information which Defendants could have used to impeach Mr. Smith and corroborate their version of what occurred during the shooting); and (3) the ADA failed to act when her witness, Mr. Smith, gave the false impression that he was not actively involved in dealing marijuana, in violation of
 
 Brady
 
 and
 
 Napue.
 

 In
 
 Brady,
 
 the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment."
 
 Brady,
 

 373 U.S. at 87
 
 ,
 
 83 S.Ct. at 1196-97
 
 ,
 
 10 L.Ed.2d at 218
 
 . Further, that Court has instructed that "[i]mpeachment evidence [which the defense could use against a government witness] as well as exculpatory evidence, falls within the
 
 Brady
 
 rule."
 
 United States v. Bagley,
 

 473 U.S. 667
 
 , 676,
 
 105 S.Ct. 3375
 
 , 3380,
 
 87 L.Ed.2d 481
 
 , 490 (1985) ;
 
 see also
 

 State v. Williams,
 

 362 N.C. 628
 
 , 636,
 
 669 S.E.2d 290
 
 , 296 (2008) (recognizing that the Due Process Clause prohibits a prosecution from suppressing "impeachment evidence or exculpatory evidence"). Further, a prosecutor's duty to disclose extends beyond the prosecutor's case file to other materials in the possession of governmental investigative agencies.
 
 Kyles v. Whitley,
 

 514 U.S. 419
 
 , 437,
 
 115 S.Ct. 1555
 
 , 1567,
 
 131 L.Ed.2d 490
 
 , 508 (1995) (recognizing that the "prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"). And a Due Process Clause violation occurs when such evidence is suppressed "irrespective
 
 *97
 
 of the good faith or bad faith of the prosecution."
 
 Williams,
 

 362 N.C. at 636
 
 ,
 
 669 S.E.2d at 296
 
 .
 

 In
 
 Napue,
 
 the United States Supreme Court held that a due process violation occurs when a State witness offers false testimony which the prosecution knew or should have known was false.
 
 Napue,
 

 360 U.S. at 269, 272
 
 ,
 
 79 S.Ct. at 1177, 1178-79, 1179
 
 ,
 
 3 L.Ed.2d at 1221, 1222-23
 
 .
 
 See also
 

 *205
 

 Giglio v. United States,
 

 405 U.S. 150
 
 , 153-55,
 
 92 S.Ct. 763
 
 , 766,
 
 31 L.Ed.2d 104
 
 , 108-09 (1972) (reaffirming
 
 Napue
 
 holding in matter involving prosecution's nondisclosure of a promise to witness, namely: that he would not be charged if he testified on behalf of the prosecution). A violation occurs even where "the State, although not soliciting false evidence, allows it to go uncorrected when it appears."
 
 Napue,
 

 360 U.S. at 269
 
 ,
 
 79 S.Ct. at 1177
 
 ,
 
 3 L.Ed.2d at 1221
 
 .
 
 See also
 

 State v. Wilkerson,
 

 363 N.C. 382
 
 , 402-03,
 
 683 S.E.2d 174
 
 , 187 (2009) (citing the
 
 Napue
 
 decision for the general proposition that the use of false evidence is improper even if the prosecution does not solicit it).
 

 B. Our Court's Authority to Rule on MARs
 

 A defendant may seek a motion for appropriate relief where "[t]he conviction was obtained in violation of the Constitution of the United States or the Constitution of North Carolina." N.C. Gen.Stat. § 15A-1415(b)(3) (2013). And a defendant may make such motion
 
 in the appellate division
 
 when the case is pending in the appellate division. N.C. Gen.Stat. § 15A-1418(a) (2013).
 

 Our Court has the statutory authority
 
 to dispose of
 
 a MAR filed in our Court during an appeal if the taking of additional evidence is not necessary.
 
 See
 
 N.C. Gen.Stat. § 15A-1418(b) ("motion may be determined on the basis of the materials before" the appellate division).
 
 See also
 

 State v. Jones,
 

 296 N.C. 75
 
 , 78,
 
 248 S.E.2d 858
 
 , 860 (1978) (granting a motion for appropriate relief under N.C. Gen.Stat. § 15A-1418(a) as: "(1) the facts were sufficiently developed in the documents to enable us to rule on the legal question presented"; "(2) there was no controversy between the state and defendant as to any of the essential facts"; and "(3) it was not necessary to remand the case to the trial division [to take additional evidence and make findings]"). Otherwise, if the taking of additional evidence is necessary, it is the appellate court's duty to remand the MAR to the trial division for the taking of additional evidence.
 
 See
 
 id.
 

 C. Our Consideration of Matters Outside the Record in Ruling on the MARs
 

 Normally, any matter on appeal is decided solely on information contained in the record on appeal. However, Rule 2 of our Rules of Appellate Procedure recognizes the "residual power possessed by any
 
 *98
 
 authoritative rule-making body to suspend or vary operation of its published rules in specific cases
 
 where this is necessary to accomplish a fundamental purpose of the rules.
 
 "
 
 Hart,
 

 361 N.C. at 316
 
 ,
 
 644 S.E.2d at 205
 
 . Our courts have not hesitated to invoke Rule 2 where the substantial rights of criminal defendants are implicated.
 
 See, e.g.,
 

 State v. Sanders,
 

 312 N.C. 318
 
 , 320,
 
 321 S.E.2d 836
 
 , 837 (1984) (per curiam).
 

 Here, Defendants seek relief on the basis of newly discovered, documentary evidence obtained subsequent to the filing of the Record which establishes the ADA's failure to disclose information which she knew or had reason to know was favorable to Defendants, in violation of their substantial rights under
 
 Brady
 
 and
 
 Napue.
 
 The e-mails contain the ADA's own words, and the State makes no argument that the e-mails are not authentic. We conclude that it is not necessary to remand the matter to the trial court to conduct an evidentiary hearing on the matter. The e-mails speak for themselves. These e-mail communications establish that on 22 August 2014-two months prior to Defendants' trial-the RPD raided a "stash" house operated by Mr. Smith and others while Mr. Smith was not present, and discovered a large quantity of marijuana.
 
 [2]
 

 In December 2015, based on information uncovered during Mr. Smith's federal prosecution, Defendants' counsel contacted the ADA about certain correspondence she had with the RPD detective regarding a 22 August 2014 raid on a certain drug stash house.
 

 *206
 
 The ADA responded that she had no notes of any such conversations or any e-mails with the RPD except those which she had already provided.
 

 Thereafter, Defendants' counsel was told by Mr. Smith's defense attorney in the federal prosecution that the federal prosecutor had disclosed specific e-mail communications between the ADA and the RPD detective regarding the stash house raid. Upon learning this information, Defendants' counsel again contacted the ADA about alleged communications she had with the RPD prior to Defendants' trial concerning her star witness' drug activities, to which she admitted that she communicated with the RPD detective through her private Yahoo e-mail account:
 

 Back in December [2015], I told you that I had looked through my "nccourts" email account and had not found
 

 *99
 

 any correspondence with [the RPD detective], which is accurate. However, right after the holidays, as I was driving to work one morning, it dawned on me that back at that time [summer/ fall of 2014] that I tried your client,
 

 I often used a "yahoo" email account to correspond with law enforcement officers, and I had not looked in that account. As soon as I got to work, I looked through that account, and located the five emails that I have attached.
 

 (Emphasis added.) The ADA then disclosed five e-mails containing correspondence between her and the RPD detective prior to Defendants' trial concerning Mr. Smith's drug trafficking activities, activities which Mr. Smith denied on the stand during Defendants' trial:
 

 27 July 2014 e-mail from the ADA to the RPD detective investigating Marcus Smith for alleged drug trafficking (one month prior to the stash house raid):
 

 I am ... reaching out to you because Marcus Smith is the victim in a fairly nasty home-invasion case of mine that is set to go to trial in the very near future, so I'd like to talk to you a bit about it, as well as educate myself on what your investigation entails, before anything too much further happens.
 

 27 July 2014 e-mail response from RPD detective to ADA:
 

 I ... would be happy to meet at your convenience. Please call or text my cell phone and we can schedule a time.
 

 30 July 2014 e-mail from ADA to RPD detective:
 

 Please don't hate me, but we've set the trial date for 10/6. Good news is that I will do all three of my defendants [Defendants and Mr. Baldwin], so once we're done, we'll be really done! I'm sorry-but I really appreciate your understanding and willingness to work with me on this....
 

 19 August 2014 e-mail from RPD detective to ADA (3 days before the stash house raid):
 

 I have located the stash house for Mr. Smith and have obtained P.C. [probable cause] to apply for a search warrant for it. I would like to execute the search warrant on the home this week when Smith is not there. It is not
 
 *100
 
 Smith's house. He does not maintain any utilities there. I would not be charging Smith with any crimes. Please get back to me when you have time.
 

 26 September 2014 e-mail from ADA to RPD detective (1 month after the raid):
 

 I assume nothing earth-shattering is happening on your end, otherwise I would've gotten a call from either you or [Mr. Smith's] lawyer:). I wanted to tell you that (let me preface this with: PLEASE DON'T HATE ME PLEASE DON'T HATE ME PLEASE DON'T HATE ME) [Defendant] Sandy's lawyer got scheduled by a federal court judge for next week [the scheduled 10/6 trial date], and we've had to bump the trial back a month. We are now set for 10/26....
 

 The State has made no argument that these e-mails are inauthentic.
 

 D. Evidence in the Record Relevant to the MAR
 

 In the Record itself, there are numerous statements made by Mr. Smith and by the ADA during the October 2014 trial, two months after the stash house raid, which suggest that Mr. Smith was not a drug trafficker. For example, the ADA elicited testimony from Mr. Smith that he had no pending charges, testimony, which though true, can be viewed as misleading. During the course
 
 *207
 
 of the trial, the ADA admitted that Mr. Smith had denied any involvement in drug trafficking:
 

 Mr. Smith has been asked ... is he still participating in drug sale activity.
 
 His answer was no
 
 .... I, again, no problem with him being asked if he is still participating in that type of activity.
 
 He asked and he answered the question.
 

 (Emphasis added.) During closing arguments, the ADA discounted Defendants' version of the events, namely that Defendants were confronting a drug dealer about a recent transaction, by pointing out the lack of evidence that Mr. Smith was involved in drug trafficking:
 

 There has been absolutely no evidence from the witness stand outside the Defendants' testimony that this has anything to do with drugs.... The Defendants are the only people who've been talking about drugs....
 
 From that, the defense wants to make you believe that Marcus Smith is apparently a drug kingpin.
 

 (Emphasis added.)
 

 *101
 
 E. Violation of Defendants' Constitutional Rights
 

 On the basis of the materials in the Record and the undisputed, documentary evidence submitted in support of the MARs, we hold that Defendants' constitutional rights were violated. Their due process rights were violated by the ADA's failure to provide them information concerning the drug trafficking activities of the State's star witness, Mr. Smith.
 
 See
 

 Brady,
 

 373 U.S. at 87
 
 ,
 
 83 S.Ct. at 1196-97
 
 ,
 
 10 L.Ed.2d at 218
 
 . Defendants' version of events on the night in question was built on the premise that the alleged victim, Mr. Smith, was in fact a drug dealer. The ADA's e-mails cited above conclusively establish that the ADA knew or had reason to know of information which would have been helpful to Defendants and failed to disclose it. We see no need to remand the matter to the trial court for the taking of additional evidence
 
 on this point.
 
 Again, the e-mails speak for themselves.
 

 Further, Defendants' due process rights were violated by the ADA's failure to correct the false testimony given by the State's star witness, Mr. Smith. As the United States Supreme Court has stated:
 

 'It is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt. A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct when [s]he knows to be false and elicit the truth. [Even if] the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair.'
 

 Napue,
 

 360 U.S. at 269-70
 
 ,
 
 79 S.Ct. at 1177
 
 ,
 
 3 L.Ed.2d at 1221
 
 .
 
 See
 

 Hamric v. Bailey,
 

 386 F.2d 390
 
 , 394 (4th Cir.1967) ("[D]ue process is violated not only where the prosecution uses perjured testimony to support its case, but also where it uses evidence which it knows creates a false impression of a material fact.")
 

 We hold that these violations were prejudicial in nature. Defendants' version of the shooting was based on their contention that they were in Mr. Smith's garage to settle accounts with Mr. Smith, not to rob him. Their self-serving testimony, however, was the only evidence that Mr. Smith was, in fact, a drug trafficker. Further, the State's key evidence was Mr. Smith's testimony. Evidence which would tend to show that at least part of his testimony was false could have made a difference in the outcome.
 
 See
 

 U.S. v. Parker,
 

 790 F.3d 550
 
 , 558 (4th Cir.2015)
 

 *102
 
 (citing
 
 Brady
 
 decision to hold that prosecution violated defendants' constitutional rights by failing to provide counsel with SEC impeachment evidence). It bears repeating that the State has failed to make any argument disputing the authenticity of the ADA-RPD e-mails. There are no questions of fact that would require an evidentiary hearing. As such, the State's reliance on
 
 Benitez
 
 and similar cases is misplaced.
 
 [3]
 

 *208
 
 IV. Conclusion
 

 We grant Defendants' MARs, thereby vacating the judgments against them. We, therefore, dismiss Defendants' appeal as moot.
 

 VACATED AND REMANDED.
 

 Judges CALABRIA and DIETZ concur.
 

 [1]
 

 The State has argued that our Supreme Court's recent decision in
 
 State v. Benitez
 
 bars appellate review of an MAR filed pursuant to N.C. Gen.Stat. § 15A-1418 if the underlying evidence is not part of the record on appeal.
 
 State v. Benitez,
 

 368 N.C. 350
 
 , 350,
 
 777 S.E.2d 60
 
 , 60 (2015). However,
 
 Benitez
 
 is distinguishable because in that case there was a need for the trial court to make findings regarding an evidentiary dispute, whereas here, the State has not argued that the e-mails are not authentic. Further, in
 
 Benitez,
 
 there was no invocation of Rule 2 for the consideration of evidence outside the record.
 

 [2]
 

 We note that during discovery, Defendants specifically made a discovery request seeking
 
 Brady
 
 evidence, including "[a]ny notes taken or reports made by investigating officers which would ... contradict other evidence to be presented by the State" and also "any and all information of any of the types herein requested that comes to the attention of the District Attorney's Office after compliance with this request, or which, by the exercise of due diligence should have been known to the District Attorney."
 

 [3]
 

 We note that Defendants have produced
 
 other
 
 information in support of their MARs. Further, we note that some of this
 
 other
 
 information may require the taking of additional evidence. However, we conclude that we can resolve Defendants' MARs based on the e-mails alone. Perhaps more evidence is required to discover the ADA's true motive; however, such evidence is not necessary for our purposes in this appeal. The constitutional violation occurred irrespective of the ADA's motive.
 
 Williams,
 

 362 N.C. at 636
 
 ,
 
 669 S.E.2d at 296
 
 .