**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-4339

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

GERMAINE CANNADY,

Defendant - Appellant.

Appeal from the United States District Court for the District of Maryland, at Baltimore. Richard D. Bennett, District Judge. (1:14-cr-00389-RDB-2)

Argued: January 29, 2019                    Decided: May 8, 2019

Before WILKINSON, DIAZ, and FLOYD, Circuit Judges.

Affirmed by published opinion. Judge Floyd wrote the opinion in which Judge Wilkinson and Judge Diaz joined.

**ARGUED:** Richard S. Stolker, UPTOWN LAW, LLC, Rockville, Maryland, for Appellant. Christopher Michael Rigali, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Robert K. Hur, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

FLOYD, Circuit Judge.

A jury convicted appellant Germaine Cannady of conspiracy to distribute and possession with intent to distribute cocaine and heroin, in violation of 21 U.S.C. § 841(a)(1), and attempted possession with intent to distribute cocaine and heroin, in violation of 21 U.S.C. § 841(b)(1)(A). Cannady appeals his conviction on several grounds. First, he claims there was a fatal variance between the single conspiracy charged in the indictment and the evidence offered against him at trial. Second, he claims the district court erred in refusing to give a jury instruction on multiple conspiracies. Third, he claims the district court erred in refusing to sever his trial from his codefendants'. Finally, he claims the district court erred in denying his motion for acquittal. For the reasons set forth below, we reject Cannady's arguments and affirm his conviction.

I.

In August 2014, Federal Bureau of Investigation (FBI) agents arrested Michael Barrett after a search of his recreational vehicle recovered 25 kilograms of cocaine and six kilograms of heroin in hidden compartments. Barrett told agents he purchased the drugs from a supplier in California and was preparing to sell them in Baltimore to a number of lower-level distributors, including Cannady. This account was partially confirmed when, while being interviewed by the FBI, Barrett received a call from Cannady inquiring about the incoming shipment.

2

In the days following his arrest, Barrett cooperated with the FBI by participating in a reverse sting operation. In a series of recorded phone calls, Barrett spoke with Cannady and other lower-level distributors and arranged to meet them to deliver their share of the incoming shipment. On one of these calls, Cannady told Barrett to make sure the shipment contained "both," which Barrett later testified referred to both cocaine and heroin. J.A. 238. Cannady also advised Barrett how much to charge for the drugs, explaining that he was not going to let customers "get over on" Barrett because Cannady had "been out in the field" and knew the going prices for various drugs. J.A. 239. Barrett directed Cannady and several other associates to meet him on August 11. Cannady asked Barrett whether he should bring three other lower-level distributors—Dominic Parker, Cornell Brown, and Tavon Hopkins—with him to the prearranged location. Barrett replied that he preferred for the group to come in pairs of two and directed Cannady to pick up his share of the shipment with Parker. When the two arrived together, they were arrested by waiting FBI agents. A subsequent search of their car turned up four cell phones and a police scanner.

A grand jury indicted Cannady and eight codefendants for conspiracy to distribute and possession with intent to distribute cocaine and heroin. Each defendant was also individually charged with attempting to possess with intent to distribute various quantities of controlled substances based on their recorded phone calls with Barrett. Five of the defendants pleaded guilty. The remaining four—Parker, Cannady, Brown, and Ronald Sampson—proceeded to trial.

3

Barrett was the government's primary witness at trial. He testified that in the fall of 2013, he began receiving large quantities of cocaine and heroin from a supplier in California. Between November 2013 and June 2014, Barrett received five shipments of drugs, which he sold in Baltimore and Washington, D.C. through a network of confederates. According to Barrett, Cannady joined the operation around February 2014, when Barrett received his third shipment (consisting of 20 to 25 kilograms of cocaine). Barrett repeatedly supplied Cannady and others with kilogram quantities of cocaine and heroin until Barrett's arrest in August 2014.

Barrett described at length the coordinated nature of the distribution scheme. He arranged for his team to conduct business in pairs to help avoid detection; Hopkins, who pleaded guilty before trial, typically partnered with Brown, while Cannady worked with Parker. When Barrett learned it would be difficult to obtain cocaine from his California supplier, he conferred with the group before deciding to import heroin instead. When Barrett asked the group how much each of them could sell, Cannady offered to sell three kilograms of heroin himself, but cautioned Barrett against importing more than five kilograms total for the group. Barrett also testified that he referred customers who requested quantities of drugs smaller than a kilogram to Cannady or other lower-level distributors. *See* J.A. 193 ("So if it's somebody that wants something under a kilo, I'll link them up with Jermaine [sic] or Nic [Parker] or Nelly [Brown], because I don't own a scale."). When defendant Sampson asked Barrett to supply him with heroin to sell, Barrett obtained 100 grams from Cannady to give to Sampson.

4

Barrett described Cannady as his "underboss" and testified that he was grooming Cannady to take on a more prominent role in the enterprise. J.A. 232 ("I was trying to put myself in a position where [Cannady] would like pick up the drug . . . and I wouldn't have to do nothing but just at the end of the day just collect the money."). In addition to advising Barrett on the going price of certain drugs, Cannady purchased burner phones and a police scanner to help the group avoid detection. Cannady also supplied Barrett with prescription pain medication purchased from the black market for Barrett's personal use.

Following a nine-day trial, the jury convicted Cannady on both the conspiracy and attempt counts. The defendants subsequently filed a motion for a new trial based on an alleged *Brady* violation, *see Brady v. Maryland*, 373 U.S. 83 (1963), which the district court granted. This Court reversed and remanded.[1] The district court then reentered judgment against Cannady, and he timely appealed.

## II.

Cannady appeals his conviction on several grounds. First, he claims there was a fatal variance between the single conspiracy charged in the indictment and the evidence offered at trial. Second, he claims the district court erred in refusing to give a jury instruction on multiple conspiracies. Third, he claims the district court erred in refusing

---

[1] While that appeal was pending, three of the four defendants pleaded guilty to a single count of attempted possession with intent to distribute. Cannady is the sole remaining defendant.

to sever his trial from his codefendants'. Finally, he claims the district court erred in denying his motion for acquittal. Discerning no reversible error, we affirm Cannady's conviction.

A.

Cannady claims that allegations in the indictment differed from the evidence offered against him at trial, resulting in a violation of his Fifth Amendment rights. "[I]t is well established that a court cannot permit a defendant to be tried on charges that are not made in the indictment against him." *United States v. Moore*, 810 F.3d 932, 936 (4th Cir. 2016) (internal quotation marks omitted). "When the government, through its presentation of evidence and/or its argument . . . broadens the bases for conviction beyond those charged in the indictment, a constructive amendment—sometimes referred to as a fatal variance—occurs." *United States v. Randall*, 171 F.3d 195, 203 (4th Cir. 1999). Because a fatal variance "change[s] the elements of the offense charged, such that the defendant is actually convicted of a crime other than that charged in the indictment," it "violates the Fifth Amendment right to be indicted by a grand jury, is error *per se*, and must be corrected on appeal even when the defendant did not preserve the issue by objection." *Id.* (internal quotation marks and citation omitted). Not all variances between an indictment and the proof offered at trial are "fatal." "A variance constitutes a legitimate grounds for reversal only if the appellant shows that the variance infringed his 'substantial rights' and thereby resulted in actual prejudice." *United States v. Kennedy*, 32 F.3d 876, 883 (4th Cir. 1994).

6

Cannady claims that while the indictment alleged a single conspiracy, evidence at trial proved the existence of multiple independent conspiracies between Barrett and his lower-level distributors. "In order to show actual prejudice stemming from a multiple conspiracy variance, an appellant must prove that there are so many defendants and so many separate conspiracies before the jury that the jury was likely to transfer evidence from one conspiracy to a defendant involved in an unrelated conspiracy." *Id.* (internal quotation marks omitted). The defendant bears the burden of establishing a prejudicial variance. *United States v. Malloy*, 568 F.3d 166, 178 (4th Cir. 2009).

Cannady has not met this burden here, as the evidence presented at trial comports with the single conspiracy alleged in the indictment. As we have observed, the question of "[w]hether there is a single conspiracy or multiple conspiracies depends upon the overlap of key actors, methods, and goals." *United States v. Strickland*, 245 F.3d 368, 385 (4th Cir. 2001) (internal quotation marks omitted); *see also United States v. Banks*, 10 F.3d 1044, 1054 (4th Cir. 1993) ("It is of course elementary that one may be a member of a conspiracy without knowing its full scope, or all its members, and without taking part in the full range of its activities or over the whole period of its existence.").

Barrett's testimony described a conspiracy in which defendants were aware that they were part of a broader distribution scheme involving the same actors, methods, and goals. The actors were Barrett's core group of lower-level distributors, which expanded as his operation grew but, according to Barrett, involved all defendants by February 2014. The method of operation and the goals of the conspiracy remained the same throughout its existence: Barrett imported kilogram quantities of cocaine and heroin from California

7

and provided it to his lower-level distributors who sold it for a profit throughout Baltimore and Washington, D.C.  Barrett testified that the group discussed the general plans of the enterprise, such as the quantity and types of drugs to import, with one another.  *See* J.A. 188 (describing conversations between Barrett and defendants regarding the quantity of heroin the group should import); J.A. 209 (describing how the group "all sat down and talked" to prepare for the August delivery).  Barrett also referred customers who wanted to either buy or sell in quantities lower than a kilogram to Cannady or other lower-level distributors.

In addition to the coordinated nature of the overall conspiracy, evidence at trial reflected Cannady's extensive knowledge of and involvement in the enterprise.  Cannady's inquiry as to whether he should bring Parker, Brown, and Hopkins with him to pick up the August delivery indicates that at the very least, Cannady was aware of the broader distribution scheme and familiar with other lower-level distributors.  However, Barrett's testimony went further.  He described Cannady as the "underboss" of the operation who knew everyone Barrett worked with.  *See* J.A. 232 ("Everybody that I distribute drugs to, whether it be cocaine or heroin, I wanted Jermaine [sic] to meet.").  Cannady not only purchased drugs from Barrett for further distribution, but he also advised Barrett on pricing and procured equipment to help the group evade law enforcement.

Cannady claims that evidence at trial established several independent conspiracies between each defendant and Barrett: a hub-and-spoke operation with no connecting rim.[2] Not only is this construal of the facts belied by the evidence presented at trial, but we have held that "it is not necessary to proof of a conspiracy that it have a discrete, identifiable organizational structure." *Banks*, 10 F.3d at 1054. Instead, we look to "whether the various participants had to know from the nature of the contraband and the vastness and regularity of their own dealings . . . that the illegal efforts of others were required to make their own dealings possible." *Id.* (internal quotation marks and brackets omitted). The evidence established a clear relationship among Barrett's core group of coconspirators through which they were made aware of their roles in the larger scheme. We therefore hold that there was no fatal variance between the indictment and the evidence offered at trial.

## B.

Cannady next contends that the district court committed reversible error in failing to give a multiple conspiracy instruction to the jury. We review the district court's denial

---

[2] Cannady relies on *Kotteakos v. United States*, in which the Supreme Court held that the government had not proven a single conspiracy when it showed "no connection" between defendants other than their dealings with the "common key figure" who obtained fraudulent loans on their behalf. 328 U.S. 750, 752–54 (1946); *id.* at 758 (referring to defendants as "different persons who did not know or have anything to do with one another"). *Kotteakos* is readily distinguishable, as evidence presented at trial indicated that defendants in the present case not only knew they were part of a broad distribution scheme, but also associated directly with one another to further its purpose.

of a proposed jury instruction for abuse of discretion. *United States v. Bartko*, 728 F.3d 327, 343 (4th Cir. 2013). Refusal to issue a requested instruction "amounts to reversible error only if the instruction: (1) was correct, (2) was not substantially covered by the charge that the district court gave to the jury, and (3) involved some point so important that the failure to give the instruction seriously impaired the defendant's defense." *Id.*

"A court need only instruct on multiple conspiracies if such an instruction is supported by the facts." *United States v. Mills*, 995 F.2d 480, 485 (4th Cir. 1993). "A multiple conspiracy instruction is not required unless the proof at trial demonstrates that appellants were involved only in separate conspiracies *unrelated* to the overall conspiracy charged in the indictment." *Kennedy*, 32 F.3d at 884 (internal quotation marks omitted). Moreover, "even if one overarching conspiracy is not evident, the district court's failure to give a multiple conspiracies instruction is reversible error only when . . . the evidence of multiple conspiracies [was] *so* strong in relation to that of a single conspiracy that the jury probably would have acquitted on the conspiracy count had it been given a cautionary multiple-conspiracy instruction." *Bartko*, 728 F.3d at 344 (internal quotation marks omitted).

The district court did not abuse its discretion in failing to give a multiple conspiracy instruction. As discussed, the evidence presented at trial described a single conspiracy with overlapping actors, methods, and goals. Given the strong evidence favoring a single conspiracy, we are unable to say that "the jury probably would have acquitted on the conspiracy count had it been given a cautionary multiple-conspiracy instruction." *Id.* Moreover, Cannady cannot demonstrate that he was involved "*only* in a

10

separate conspiracy *unrelated* to the overall conspiracy charged in the indictment," *Kennedy*, 32 F.3d at 884 (first emphasis supplied), since Barrett testified extensively as to Cannady's prominent role in the drug distribution enterprise described in the indictment. Hence, we are unconvinced that the district court committed reversible error in refusing to give a multiple conspiracy charge.

## C.

Cannady next contends that the district court erred in refusing to sever his trial from his codefendants'. Cannady argues that the conspiracy charge should have been tried separately from the individual attempt charges, and that the individual attempt charges should have been tried separately from one another. Cannady's argument is unconvincing. Joinder of the defendants and offenses was proper, and the district court did not commit reversible error in refusing to sever the trial.

"We review de novo the district court's refusal to grant defendants' misjoinder motion to determine if the initial joinder of the offenses and defendants was proper under Fed. R. Crim. P. 8(a) and 8(b) respectively." *United States v. Mackins*, 315 F.3d 399, 412 (4th Cir. 2003). "If the initial joinder was proper, we must then determine if the district court abused its discretion under Fed. R. Crim. P. 14 in denying pre-trial motions to sever." *Id.* "If the initial joinder was not proper, however, we review this nonconstitutional error for harmlessness, and reverse *unless* the misjoinder resulted in no actual prejudice to the defendants because it had no substantial and injurious effect or

11

influence in determining the jury's verdict." *Id.* (internal quotation marks and brackets omitted).

An indictment may join two or more offenses if they "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). Similarly, an indictment may join two or more defendants if those defendants "are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." *Id.* at 8(b). We have observed that "neither set of requirements is onerous," and that Rule 8 "permit[s] very broad joinder . . . at the pleading stage." *Mackins*, 315 F.3d at 412.

Neither the defendants nor the offenses were improperly joined in this case. The conspiracy charge and the individual attempt charges are based on one drug distribution scheme. While Barrett's arrest and subsequent cooperation with the government may have ended his own involvement in the conspiracy, the defendants continued to conspire with one another in furtherance of the same scheme. The planned transactions that formed the basis of the individual attempt charges were part of the series of drug sales comprising the larger conspiracy. It follows that the general conspiracy and individual attempt charges "constitute[d] parts of a common scheme or plan" and were properly joined under Rule 8. *See* Fed. R. Crim. P. 8(a). And just as the individual attempt charges are logically related to the overall conspiracy charge, they are also logically related to each other. They involved the same shipment of drugs, drug distributor, date, and location.

12

Given that joinder was proper, the district court did not abuse its discretion in refusing to sever the trial. Courts generally "adhere to the principle that defendants indicted together should be tried together, and a defendant must show that he was prejudiced by the denial of a severance motion in order to establish that the district court abused its broad discretion in that regard." *United States v. Lighty*, 616 F.3d 321, 348 (4th Cir. 2010).

Cannady argues that he was prejudiced by the district court's denial of his severance motion because evidence supporting Cannady's attempt charge—the recorded phone calls and physical evidence collected when Cannady was arrested—unfairly bolstered the case against him on the general conspiracy charge. Cannady further argues that by allowing the individual attempt charges to be tried together, the district court made it more difficult for defendants to argue that they did not intend to pick up drugs from Barrett when they arrived at the prearranged location on August 11. These arguments give us no reason to depart from the general principle that "defendants indicted together should be tried together." *Lighty*, 616 F.3d at 348. The individual attempt charges and the general conspiracy are part of the same overall scheme. Cannady has pointed to no evidence that failure to sever prejudiced him in a way that would require reversal. As we have said, "a defendant is not entitled to severance merely because he might have had a better chance of acquittal in a separate trial." *Id.* We therefore hold that the district court did not err in refusing to sever Cannady's trial from his codefendants'.

D.

Finally, Cannady argues the district court erred in denying his motion for a judgment of acquittal because the evidence presented at trial was insufficient to convict him. We review the district court's denial of a motion for acquittal de novo. *United States v. Green*, 599 F.3d 360, 367 (4th Cir. 2010). Where, as here, the appellant challenges the sufficiency of the evidence against him, we view the evidence presented at trial in the light most favorable to the government, and we affirm if "*any* rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *United States v. Murphy*, 35 F.3d 143, 148 (4th Cir. 1994) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Cannady argues that the government has failed to prove that he engaged in the overarching conspiracy alleged in the indictment. According to Cannady, the government provided no evidence aside from Barrett's testimony that Cannady had a relationship with Barrett prior to their recorded phone calls. And those calls, Cannady contends, cannot prove his involvement in the conspiracy, because Barrett was acting as a government agent when the calls were made.

These arguments are without merit. The government presented substantial evidence from which a rational trier of fact could conclude that Cannady engaged in the conspiracy alleged in the indictment. Barrett's testimony indicated that Cannady had an extensive role in the enterprise beginning in early 2014, which involved not only purchasing drugs, but also selling and facilitating sales, helping the group avoid detection, and planning the types and quantities of drugs to import. While Cannady may

contest the reliability of Barrett's testimony because Barrett was a cooperating witness, it is for the jury, not this Court, to gauge witness credibility. Following Barrett's direct testimony, the defense cross-examined him for three days and attempted to impeach him by drawing attention to the leniency he received for testifying as well as his drug use. Viewing the evidence in the light most favorable to the government, as we must, we conclude that the district court did not err in denying Cannady's motion for acquittal.

Finally, we briefly address Cannady's claim that the government engaged in "outrageous conduct" by "providing illegal prescription medication" to Barrett, thereby violating Cannady's due process rights and necessitating acquittal. Opening Br. of Appellant at 28. This claim is meritless. Special Agent Eric Nye of the FBI testified that while Barrett was being interviewed, agents gave him medication at his request that was prescribed in his name and had been confiscated from his vehicle. Cannady does not explain what about this conduct makes it "outrageous." For support, he cites caselaw holding that the government did *not* act outrageously. *See United States v. Russell*, 411 U.S. 423, 432 (1973) (holding that government's conduct was not outrageous when agent supplied the defendant with a chemical necessary to manufacturing methamphetamine); *United States v. Goodwin*, 854 F.2d 33, 36 (4th Cir. 1988) (holding that government's conduct was "not unreasonable and a fortiori not outrageous" in setting up a sting operation involving sending child pornography through the mail). In short, Cannady has given us no basis in fact or law to hold that the government acted outrageously.

III.

15

For the foregoing reasons, Cannady's conviction is

*AFFIRMED.*