**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 21-4541**
_____

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

CLIFTON MOSLEY,

Defendant – Appellant.

_____

Appeal from the United States District Court for the District of Maryland, at Baltimore.
George Jarrod Hazel, District Judge.  (1:17-cr-00667-GJH-2)

_____

Argued:  December 12, 2025                    Decided:  February 23, 2026
                              Amended:  February 24, 2026

_____

Before NIEMEYER, GREGORY, and AGEE, Circuit Judges.

_____

Affirmed by published opinion.  Judge Gregory wrote the opinion, in which Judge Niemeyer and Judge Agee joined.

_____

**ARGUED:**  Richard S. Stolker, LAW OFFICES OF RICHARD S. STOLKER, Gaithersburg, Maryland, for Appellant.  Jason Daniel Medinger, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.  **ON BRIEF:** Kelly O. Hayes, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

_____

GREGORY, Circuit Judge:

Clifton Mosley appeals his conviction by a jury of witness-murder and marijuana trafficking. During trial, the Government presented evidence that Mosley was friends and drug-trafficking partners with Davon Carter and Matthew Hightower. Hightower had been indicted for healthcare fraud and extortion, due to information provided to the authorities by his co-worker Lisa Edmonds. Edmonds was to be a key witness in Hightower's upcoming trial.

The Government alleges that while Hightower was detained pretrial, Mosley and Carter conspired with Hightower to murder Lisa Edmonds. Witness testimony and phone records show that Mosley and Carter were in communication with Hightower and each other, especially in the days and hours leading up to the murder at issue.

On May 27, 2016, two hours before Lisa Edmonds was due to attend a court hearing, a man chased, shot, and killed her next-door neighbor, Latrina Ashburne. The Government alleges that the shooter, Davon Carter, had mistaken Ashburne for Edmonds. Police found surveillance footage of two cars circling the neighborhood in the hour before the shooting, and eventually traced the cars as being associated with Carter and Mosley.

Carter and Mosley were convicted after a 13-day trial of witness-murder and marijuana trafficking. Mosley now appeals his conviction on three grounds: (1) that his witness-murder charges should have been severed from his marijuana trafficking charges; (2) that cell evidence found on Carter should have been suppressed under the Fourth Amendment; and (3) that there was insufficient evidence for a jury conviction.

2

Mosley fails to present sufficient grounds to reverse the district court and vacate the conviction. First, the marijuana trafficking is deeply intertwined with the murder charges, because the marijuana trafficking is what connects Carter, Mosley, and Hightower and establishes their relationship as both friends and business partners. Without the marijuana trafficking, the Government could not have proven that Carter and Mosley had motive to kill Hightower's opposing witness. Second, Mosley lacks standing to bring Fourth Amendment claims for items found on Carter. And third, the evidence at trial was certainly substantial enough for a conviction. For these reasons, we affirm the district court and sustain the jury conviction.

## I.

## A.

Clifton Mosley was a long-time friend of Matthew Hightower and Davon Carter. Before and after Hightower's arrest, the three men sold marijuana together, with some witnesses identifying Mosley as Hightower's "right-hand man," "home boy," and "wingman."

On June 3, 2015, Hightower was indicted on charges of health care fraud. Hightower had been working as a delivery driver at RX Resources and Solutions ("RXRS"), a medical equipment company. In 2013, it came to light that RXRS was billing customers for supplies that were never delivered. Lisa Edmonds, Hightower's coworker, reported this to the U.S. Department of Health and Human Services, eventually leading to Hightower's indictment.

After the indictment, witnesses and Hightower began to speculate that Lisa Edmonds was the informant. Hightower speculated that Edmonds might even have been recording them. In a recorded jail call on March 15, 2014, Hightower told Carter that the investigation into RXRS "probably all stem[med] from that lady [Edmonds]" who reported some "illegal shit going on." JA 2387.

On June 17, 2015, Hightower was granted pretrial release subject to certain restrictions, including that he should not have any contact with potential government witnesses. Nonetheless, on July 25, 2015, Hightower emailed Edmonds asking to speak, to which she declined to respond. In October 2015, Edmonds noticed a BMW routinely sitting outside of her house at night. Meanwhile, Hightower also spoke regularly with Mosley and Carter, as evidenced by texts and call history from his cellphone and testimony from witnesses.

On April 19, 2016, a federal grand jury returned a superseding indictment against Hightower, adding charges about extortion that ultimately led to Hightower's pretrial detention. Hightower was again instructed not to contact government witnesses, specifically including Edmonds.

Hightower did maintain contact with Mosley and Carter. A search of Hightower's cell later revealed a scrap of paper containing Mosley and Carter's phone numbers under the names "Cliff" and "Davon." Witnesses testified that in Hightower's absence, Carter asserted that he had taken over the drug trafficking business. Witnesses also testified that after Hightower's imprisonment, they began to buy marijuana through Mosley instead.

4

Altogether, Mosley and Carter had 148 calls, messages, and other phone communications in May 2016, which were mostly phone calls with several messages coordinating meetups.

On May 16, 2016, Carter and Mosley met in person. They went to breakfast together at IHOP, at which time they received a call from Hightower. During this call, Mosley assured Hightower that he was going to "beat" the charges. He also promised Hightower, "[E]verything going to be good, yo . . . . You know what I mean? I'm gonna hold you down. You know what I mean? On my end." JA 2407. Importantly, while Mosley was traveling with Carter that morning, Carter got a speeding ticket while driving a 2008 silver Audi with a rear Maryland tag, but was missing a front license plate and instead had a European-style tag.

Mosley and Carter met again on May 17, 2016. This time they included Shayne Bird, who knew Hightower from when they were incarcerated. Bird owned a towing company. Bird testified that during the meeting, Mosley and Carter asked Bird whether he could tow one of Hightower's Audis to Bird's shop. Bird also testified that he did not agree to do that job because he "didn't feel comfortable dealing with them anymore." JA 1329.

Around this time, Carter spoke to his friend Clarence Sampson. Sampson testified that Carter said that "somebody was telling on him [Hightower] and he [Carter] has to handle it." JA 1031. Then on May 25, 2016, Carter obtained and activated a new burner phone. Using the burner, Carter messaged Mosley and said, "This is Davo, lock me in." JA 694, 2273.

Late in the evening on May 26, 2016, Mosley woke up his girlfriend and asked her to teach him how to look up cases on the Maryland judiciary's website. The Government

5

contends that Mosley was trying to check for Edmond's address through the state court case information available online. Edmonds was in fact scheduled to appear in court on the next day, May 27, 2016, at 9:30 AM in an unrelated matter. Her home address was fully visible. On the night of May 26, 2016, at 9:13 PM and 10:04 PM, Mosley and Carter had two brief calls.

On May 27, 2016, Mosley left his apartment at some time before 6:15 AM, according to testimony from his girlfriend. His girlfriend indicated that it was unusually early. Mosley said that he had to drop his daughter off at school, although he later admitted to his girlfriend that this was a lie and that he was out to restock his drug supply. Carter also left his apartment at about 6:00 AM, according to his own girlfriend's testimony.

Shortly after the men left their homes, their respective girlfriends began to call and text their phones to confirm where they were. Neither man answered. Instead they were communicating with each other, at 6:13 AM and 6:15 AM.

Lisa Edmonds lives next door to Latrina Ashburne. At around 7:00 AM, Aquana Murray, a neighbor of Latrina Ashburne, saw a man chasing Ms. Ashburne before pulling out a gun and shooting her. Murray reported the shooter as a Black man dressed in a hoodie and jeans. The Government states that the shooter was Davon Carter, who mistook Ashburne for Edmonds and shot her. By the time the police arrived at 7:20 AM, Ashburne was lying face down in a pool of blood. She was pronounced dead at the hospital.

The police obtained security cameras from a nearby apartment complex. The footage showed the suspected shooter running away from the scene, and that the shooter had an awkward gait. Text messages and witness testimony later revealed that Carter had

6

injured his back at work several months prior to the shooting, and that he was still experiencing pain around the time of the shooting. The footage also showed two vehicles driving around and circling the area between 6:16 AM and 7:28 AM. These two vehicles were a Pontiac Grand Am and an Audi. Although the Audi's plate could not be identified, the license plate on the Pontiac was registered to Antoinette King, who was the mother of Carter's girlfriend. The girlfriend and her mother confirmed that Carter drove the Pontiac at times.

Meanwhile, Edmonds learned that her neighbor had been murdered and called law enforcement, stating that she believed the shot was meant for her. Police then investigated whether Hightower, who had previously contacted Edmonds and expressed that she was the informant for his indictment, was involved with the shooting. A search of his cell revealed the paper containing Carter and Mosley's numbers, and a search of his jail calls revealed that Hightower had spoken with Carter several times in the days leading up to the shooting.

Police then obtained a search warrant for Carter's Pontiac. As the officers were waiting to execute the warrant at Carter's home, they saw a man leave the house and enter a black BMW SUV. Police stopped the BMW, smelled marijuana, and asked Carter about it. According to police testimony, Carter admitted he had marijuana, which led to the police searching the vehicle, finding large amounts of marijuana and cash. Police also found a license plate that was later traced back to an Audi that belonged to Hightower. Witnesses testified that Mosley and Carter had driven this Audi at times.

Police took Carter to the Baltimore City Police department for questioning. They recovered three cellphones from Carter that day.

7

On August 10, 2016, police found the Audi from the surveillance at an automobile repair shop. It was missing the front license plate and instead had a European-style plate on the front.

On December 23, 2016, police interviewed Mosley. Mosley agreed to the interview, which took place at the Baltimore County Police Department. Mosley also consented to law enforcement searches of his phone. Using cell-site analysis, law enforcement determined that Carter and Mosley had been in the area of Rosalind Avenue on the morning of the shooting.

Carter was charged with Ashburne's murder in 2017. When Mosley's girlfriend learned of the news, she asked Mosley if he had anything to do with the murder. Mosley only said, "You just never know . . . it might not be over." JA 1241.

**B.**

On March 5, 2019, Mosley was charged in a superseding indictment with (1) conspiracy to murder a witness to retaliate against a person for providing information to law enforcement; (2) murder of a witness to retaliate against a person for providing information to law enforcement; (3) conspiracy to murder a witness to tamper with an official proceeding; (4) murder of a witness to tamper with an official proceeding; and (5) distribution of marijuana.

Carter filed several pretrial motions, including a motion to suppress the evidence from the seizure of his phones. Mosley filed a motion to sever, seeking a separate trial from Carter and a separate trial between the witness-murder counts and the marijuana counts.

8

The district court denied Carter's motion to suppress. The court noted that police had a search warrant for the Pontiac and saw Carter enter the Pontiac before getting into the BMW and driving away. The court held that this was enough to create a reasonable articulable suspicion to allow for a stop of the BMW. And after the officers smelled the marijuana, there was probable cause to arrest Carter and search the vehicle. The district court likewise denied the severance motions, finding that the evidence of marijuana-trafficking would be admissible as important context for the witness-murder charges, even if the counts were severed.

On September 17, 2019, Carter filed another motion to suppress, arguing that the Baltimore City Police Department lacked jurisdiction to place him in custody while he was in Baltimore County. The court denied this motion, holding that state statutory concerns about the jurisdiction of BPD officers did not impact Carter's constitutional rights. The court also held that the officers were involved in a joint federal-state law enforcement investigation, and the cross-border activity was thus permissible.

The matter proceeded to trial. After 13 days, the jury returned a guilty verdict against both Mosley and Carter on all counts.

Mosley was sentenced to life in prison as to the witness-murder counts and 60 months concurrent on the marijuana distribution counts. He now brings this appeal.

## II.

Mosley makes three arguments on appeal: (1) The witness-murder charges should have been severed from the marijuana distribution charges; (2) evidence from the search

9

of Carter's phones and car should have been suppressed; and (3) there was insufficient evidence for conviction.  For the reasons stated herein, these arguments are without merit.

### A.

Mosley appeals the district court's denial of the motions to sever the defendants and to sever the witness-murder charges from the marijuana distribution charges.

We review "de novo the district court's refusal to grant defendants' misjoinder motion to determine if the initial joinder of the offenses and defendants was proper under Fed. R. Crim. P. 8(a) and 8(b) respectively." *United States v. Cannady*, 924 F.3d 94, 102 (4th Cir. 2019) (cleaned up).  If the initial joinder was not proper, the Court reviews for harmlessness and will reverse unless the misjoinder resulted in no actual prejudice to the defendants.  *Id.*  If the initial joinder was proper, this Court reviews denials of pre-trial motions to sever for abuse of discretion.  *Id.*

The Federal Rules favor "very broad joinder." *United States v. Mackins*, 315 F.3d 299, 412 (4th Cir. 2003).  Two or more offenses can be joined if they "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."  Fed. R. Crim. P. 8(a).  Two or more defendants can be joined if those defendants "are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  Fed. R. Crim. P. 8(b).

Here, it is evident that the allegations connect Carter and Mosley to the same conspiracy to murder Edmonds.  Moreover, the underlying marijuana offenses are essential to establishing the connection between Carter, Mosley, and Hightower, giving not only

10

background information about their relationship but also providing a motive—because of the trafficking activity, Carter and Mosley were not just connected to Hightower through friendship but through financial benefits. *See United States v. Contreras*, 149 F.4th 349, 370 (4th Cir. 2025) (finding initial joinder proper where "Appellants committed the charged crimes with the same purpose of furthering the 'mission' of MS-13 and getting promoted in the gang"). Although Mosley attempts to argue that the marijuana offenses and the murder offenses ought to be severed because they are "not of the same or similar character," Rule 8 clearly permits joinder when acts "are connected with or constitute parts of a common scheme or plan." Because initial joinder comported with Rule 8, it was proper. For the same reasons, we discern no abuse of discretion in the district court's denial of Mosley's motions to sever. *See United States v. Oloyede*, 933 F.3d 302, 312 (4th Cir. 2019) ("[T]his is not one of the 'rare' cases where a defendant properly joined under Rule 8(b) with others has established that a severance was required to preserve his or her right to a fair trial." (citation omitted)).

Even if the charges were improperly joined, that error was harmless. The district court instructed the jury to separately evaluate each defendant's guilt. J.A. 1758–59; *United States v. Lane*, 474 U.S. 438, 450 (1986) ("When there are few defendants and the trial court is aware of the potential for prejudice, the risk of transference of guilt over the border of admissibility may be reduced to a minimum by carefully crafted limiting instruction with a strict charge to consider the guilt or innocence of each defendant independently."). Further, the evidence of the marijuana trafficking would have been admissible to provide critical context for the conspiracy. *See* Fed. R. Evidence 404(b)(2)

11

("[Character] evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."); *cf. United States v. Hawkins*, 76 F.3d 200, 211 (finding improper joinder was not harmless where, inter alia, the evidence of one charge would not have been admissible in a trial related to the other charge).

Joinder was proper, the district court did not abuse its discretion when denying the motions to sever, and even if there was error, it was harmless.  We therefore affirm the district court's decision.

## B.

Mosley contends that the district court wrongfully denied Carter's motion to suppress marijuana and phone evidence for two reasons:  (1) The *Terry* stop-search on his BMW lacked reasonable suspicion and (2) the Baltimore City Police did not have jurisdiction to detain Carter in Baltimore County.

We review the district court's "factual findings for clear error and its legal determinations de novo."  *United States v. Perkins*, 363 F.3d 317, 320 (4th Cir. 2004).  Where the district court has denied the motion to suppress, we must construe the evidence in the light most favorable to the government.  *Id.*

Here, we do not reach the merits of Mosley's arguments because Mosley lacks standing to raise either argument.  He cannot claim Fourth Amendment rights in the evidence collected from Carter.  The Supreme Court has held that Fourth Amendment rights "are personal" and cannot be asserted vicariously.  *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978).  It is not enough that Mosley was "'aggrieved . . . by the introduction of

12

damaging evidence.'" *United States v. Castellanos*, 716 F.3d 828, 833 (4th Cir. 2013) (quoting *Alderman v. United States*, 394 U.S. 165, 171–72 (1969)). Instead, Mosley must show that he had a legitimate expectation of privacy in the place the officer searched—but the Supreme Court has held that in general, one cannot have such an expectation in the belongings of another person. *See United States v. Padilla*, 508 U.S. 77, 82 (1993). Mosley fails to show that he is an exception to this principle. For this reason, we cannot consider the district court's denial of the suppression motion.

## C.

Mosley finally attempts to argue insufficiency of the evidence. We review *de novo* a district court's denial of a motion for judgment of acquittal. *United States v. Cowden*, 882 F.3d 464, 473 (4th Cir. 2018). In reviewing the sufficiency of the evidence supporting a conviction, the relevant question is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). A jury verdict should be affirmed when it is supported by "substantial evidence" viewed "in the light most favorable to the prosecution." *United States v. Kellam*, 568 F.3d 125, 140 (4th Cir. 2009).

Here, the facts obtained from witness testimony and physical evidence overwhelmingly connect Hightower, Carter, and Mosley—and specifically tie Carter and Mosley to the scene of the shooting at the time of the shooting. The Government has presented a complete and cohesive story for why and how the murder was committed, explaining each piece from motive to the interplay of the three cars. The jury verdict was no doubt supported by substantial evidence.

13

## III.

For the foregoing reasons, we affirm the district court's judgment and uphold the jury's verdicts.

*AFFIRMED*